MOON LAKE CONVALESCENT CENTER, Plaintiff-Appellee, v. JEREMY MARGOLIS, Acting Director of the Department of Public Health, *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—87—2967

Opinion filed February 21, 1989.—Rehearing denied April 11, 1989.

246

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Valerie J. Peiler, Assistant Attorney General, of Chicago, of counsel), for appellants.

Malcolm A. Chandler, of Chicago, for appellee.

Bruce Stratton and William A. Radkey, both of Stratton, Dobbs, Nardulli & Lestikow, of Springfield (Thomas J. Reed and Patricia A. Korn, of counsel), for amicus curiae Illinois Health Care Association.

JUSTICE BUCKLEY delivered the opinion of the court:

Following an administrative hearing on violations of the Minimum Standards, Rules and Regulations for the Licensure of Skilled Nursing Facilities and Intermediate Care Facilities (1980) (the Rules), the Director of the Department of Public Health, State of Illinois (IDPH), affirmed the hearing officer's decision to impose penalties on and revoke the license of Moon Lake Convalescent Center (Moon Lake), a long-term intermediate and skilled nursing-care facility located in Hoffman Estates, Illinois. On administrative review, the circuit court reversed the Director's decision, finding that the hearing officer lacked authority to hear the matter, that IDPH had no jurisdiction to proceed against Moon Lake, that the proceedings to revoke Moon Lake's license were moot, and that the Director's decision was contrary to the manifest weight of the evidence. The court also ordered IDPH to pay costs and attorney fees under section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—611). IDPH appeals from that judgment. For the reasons set forth below, we reverse.

These proceedings arose from an incident which occurred at Moon Lake on November 13, 1983. At approximately 10 a.m. on that morning, Moon Lake's nursing assistant Lionel Deere prepared a tub bath for one of its residents, 73-year-old Benjamin Ovitz. Ovitz, as a result of a stroke, had paralysis of his right side, wore a brace on his right leg, and articulated only by the words "yes" and "no." After checking the water temperature with his hand, Deere bathed Ovitz in the bathtub. Between 1 and 1:30 p.m. later that day, nurse Elizabeth Timm noticed that Ovitz' leg was bleeding and that Ovitz'

skin was sloughing off of his leg. Moon Lake then contacted the paramedics.

Members of the responding paramedic team determined that Ovitz had suffered a third degree burn and transported Ovitz to Humana Hospital. From there, Ovitz was transferred to the burn unit at Evanston Hospital. Dr. Charles Drueck III, the surgeon in charge of the burn unit at Evanston Hospital, observed that Ovitz had suffered third degree burns over 40% of his body, primarily on his back, buttocks, both sides, genitals and lower legs. Ovitz' knees were not burned, nor were there splatter burns. The burns were consistent with immersion in a discrete body of water.

During his hospitalization, Ovitz developed pneumonia and died on January 15, 1984. Drueck diagnosed Ovitz' cause of death as complications following his burns.

On March 12, 1984, IDPH issued a notice of complaint findings and determinations, stating that Moon Lake had violated a number of the Rules. Moon Lake, on March 23, 1984, requested a hearing on the violations. Before IDPH issued notices of penalty assessment and license revocation on July 18, 1984, Moon Lake had sold its facility to Midwest Carbridge, Inc., and surrendered its license. Discussions concerning this purchase had initiated in October 1983, and the sale was consummated in May 1984.

Hearings on the violations opened on July 31, 1984. At the first evidentiary session held on October 18, 1984, hearing officer William Stanley White announced that one of IDPH's witnesses, nurse Barbara Whelan, had been the office nurse of his parents for 17 years, working full time until 1979 and occasionally since then. White refused Moon Lake's request to recuse himself because of this relationship. White also denied Moon Lake's motions to dismiss the proceeding on grounds that White was not an "employee" of the Department, that the matter was moot based upon the sale of Moon Lake, and that IDPH had violated its own regulations by failing to provide prompt notice of the violations.

The testimony at the administrative hearing disclosed the following responses and investigations to the November 13 incident. On the day of the incident, Moon Lake supervisor Ada Irene Morris Wiren questioned Deere, who stated that he had given Ovitz a shower. Barbara Suchecki, the person with the highest authority present at the facility on November 14, collected additional information and informed director of nurses Judy Ann Schillace of the incident that afternoon. Schillace already knew that Jean Hefner, the night supervisor on November 13, was informed by Evanston Hospi-

tal that it was the medical staff's opinion that Ovitz had suffered an immersion burn. Ovitz' injury was reported to IDPH on November 16, 1983.

Detective Robert Syre from the Hoffman Estates police department investigated the incident. Syre interviewed Ovitz at Evanston Hospital, and Ovitz responded affirmatively when asked if he had received a bath. Drueck also expressed to Syre the opinion that Ovitz was burned in a bath. In an interview with Deere, Deere told Syre that he might have left the shower area for a couple of seconds to fetch a towel and that Ovitz received a shower, although on January 31, 1984, he acknowledged during testimony before a grand jury that he had in fact given Ovitz a bath.

On November 17, 1983, IDPH sent three investigators to Moon Lake to investigate a complaint of abuse and neglect. Deere told the investigators that he had given Ovitz a shower. Farrell did not issue her report regarding her investigation until January 11, 1984. The report noted citations issued to Moon Lake on November 17 for failing to timely report the Ovitz incident and for employing an unlicensed nurse who was unconnected with the November 13 incident.

On November 18, another IDPH inspector visited Moon Lake to examine its plumbing and water systems. He noted the absence of vacuum breakers and backflow preventers in some systems but issued no citations.

On February 1, 1984, registered nurse Barbara Ann Whalen and sanitarian Theodore Zelinski conducted a reinvestigation of the incident. Upon examining its records, they noted that Moon Lake's daily water temperature log for the day of Ovitz' injury showed a temperature of 110 degrees Fahrenheit. The log indicated that during November 1983, the average water temperature exceeded 110 degrees on the 5th, 7th and 22nd of the month. In January 1984, the temperature measured 130 degrees on January 18.

Upon testing the water temperature on Ovitz' floor, Zelinski and Whelan found that at different times of the day, the temperature of the water in sinks and bathtub exceeded 110 degrees. Zelinski also observed that the in-line thermometer reading of the hot water system in the basement fluctuated between 105 and 120 degrees. Zelinski cited Moon Lake for the temperatures exceeding 110 degrees in violation of the Rules requiring facilities to have protective measures to ensure that water temperatures do not exceed 110 degrees Fahrenheit.

Whalen further examined Moon Lake's "Manual of Policy and Procedure," which contained a bath policy requiring that water tem-

perature range between 95 and 100 degrees. Whalen interpreted this policy to require its staff to use thermometers to measure bath temperatures, but she admitted that no Moon Lake written policy required it to have thermometers at the baths. Whalen also admitted that no State or Federal regulation prescribed temperatures between 95 degrees and 100 degrees and that no law, policy or regulation of the State of Illinois required the use of thermometers to measure bath temperatures. Schillace informed Whalen that the bath thermometers had all been broken since September or October 1983 and that she submitted a purchasing request for new thermometers in January 1984 but the thermometers had not yet been purchased. Moon Lake's witnesses testified that Moon Lake had never regarded the 95- to 100-degrees temperature range to be absolute or as requiring thermometers to ensure that water temperature range.

After subpoenaeing documents from Evanston Hospital and from the coroner's office, Whalen completed her report on the reinvestigation on February 28, 1984. Whalen and Zelinski submitted a combined statement of deficiencies, citing Moon Lake and its staff for five violations of the Rules.

At the conclusion of the hearing on February 13, 1985, White affirmed the revocation of Moon Lake's license and the monetary penalties imposed upon Moon Lake. His decision was thereafter affirmed by the Director.

The first question presented for our review is whether the trial court erred in finding that the Nursing Home Care Reform Act of 1979 (the Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 4151—101 *et seq.*) requires that hearing officers be IDPH employees and that hearing officer White's acts were void because he was not an IDPH employee. IDPH advances three arguments in support of its position that the trial court erred in this regard.

The gist of IDPH's first argument is that the issue of the hearing officer's authority was not properly before the circuit court because the hearing officer's contract, a copy of which was attached to Moon Lake's complaint before the circuit court, was never introduced into evidence during the administrative proceedings. Section 3—110 of the Administrative Review Law provides that "[n]o new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." Ill. Rev. Stat. 1985, ch. 110, par. 3—110.

■■ ■ Moon Lake has not responded to the merits of IDPH's contention but urges that this issue be deemed waived because IDPH failed to object to the exhibit in the circuit court. We find that the

issue is not waived, as it involves a question of the circuit court's jurisdiction. Because the circuit court's subject matter jurisdiction on administrative review is a special statutory jurisdiction (*Rosecky v. Department of Public Aid* (1987), 157 Ill. App. 3d 608, 614, 511 N.E.2d 167, 171; Ill. Const. 1970, art. VI, §9), its jurisdiction is limited to the language of the Act conferring jurisdiction (*Fredman Brothers Furniture Co. v. Department of Revenue* (1985), 109 Ill. 2d 202, 210, 486 N.E.2d 893, 895-96; see also *Moore v. Board of Trustees of the Sanitary District Employees' & Trustees' Annuity & Benefit Fund* (1987), 157 Ill. App. 3d 158, 162, 510 N.E.2d 87, 91; *Brewton v. Civil Service Comm'n* (1969), 115 Ill. App. 2d 460, 466, 253 N.E.2d 504, 507 (a circuit court lacks jurisdiction where it considers questions not presented in the administrative record in violation of section 3—110 of the Administrative Review Law)). As our supreme court has stated: "In the exercise of special statutory jurisdiction, if the mode of procedure prescribed by statute is not strictly pursued, no jurisdiction is conferred on the circuit court. *** The Administrative Review Act was 'an innovation and departure from the common law, [and] the procedures it establishes must be pursued.' " [Citation.] *Fredman*, 109 Ill. 2d at 210, 486 N.E.2d at 895.

■ Nonetheless, after reviewing the record, we find that hearing officer White's contract was sufficiently in issue at the administrative proceedings and that the circuit court properly received the contract as evidence. The issue of the hearing officer's jurisdiction was timely presented before the administrative agency. Although Moon Lake did not submit the hearing officer's contract into evidence, the contents of the contract were discussed. White stated that he was a "contractual attorney" with a written contract. Moon Lake attempted to procure his contract to introduce into evidence. In a document request to IDPH, it requested that copies of White's contract be furnished to them. White, however, refused to order IDPH to turn over these documents. Under these circumstances, we find that the circuit court did not violate section 3—110 by admitting the contract into evidence.

IDPH next argues that hearing officer White's status with IDPH satisfied statutory requirements. The statutory provision in issue here, section 3—704 of the Act, which governed the review of decisions of IDPH at the time of the hearings before the administrative agency and the circuit court, provides: "Upon the receipt of a request in writing for a hearing, *the Director or a duly qualified employee of the Department designated in writing by the Director* as a hearing officer shall conduct a hearing to review the decision." (Em-

phasis added.) Ill. Rev. Stat. 1983, ch. 111½, par. 4153—704(a).

White acknowledged that his status with IDPH is that of an independent contractor. His contract with IDPH provides: "Services rendered pursuant to this agreement are not rendered as an employee of the State of Illinois and amounts paid pursuant to this agreement do not constitute compensation to an employee."

Moon Lake argues that since White is not the Director or an employee of IDPH, he had no authority under the plain language of the Act. IDPH, however, refutes Moon Lake's interpretation of the Act, contending that section 3—704(a) must be read in conjunction with sections 1—102 and 1—110 for a proper construction of the Act. Section 1—102 states that the terms defined in the article have the meanings ascribed to them unless the context otherwise requires. (Ill. Rev. Stat. 1983, ch. 111½, par. 4151—102.) Section 1—110 defines "Director" as the "Director of Public Health or his designee." (Ill. Rev. Stat. 1983, ch. 111½, par. 4151—110.) Inserting the definition of "Director" into the provisions of section 3—704(a) (Ill. Rev. Stat. 1983, ch. 111½, par. 4153—704(a)), it reads "[t]he Director or his designee or a duly qualified employee of the Department designated in writing by the Director as a hearing officer." White, IDPH contends, is a designee, as his contract states that White would "serve as a hearing officer on behalf of the Director of Public Health for the administrative proceedings for which the contractor is appointed by the Director."

Moon Lake responds that section 3—704(a) provides for a specific requirement that the designee be a Department employee and that IDPH's version of the Act would create a redundancy and render surplus the specific qualifications that the General Assembly intended. If anyone can be a "designee," Moon Lake asserts, then the "duly qualified employee" provision becomes utterly meaningless.

Both parties cite *Heritage Bank & Trust Co. v. Harris* (1985), 132 Ill. App. 3d 969, 478 N.E.2d 526, as supporting its position. In issue in *Heritage* was whether a savings and loan bank, which clearly was a "bank" under the general definition section of the Illinois Banking Act, was also a "bank" under the section of the act providing that "[a] *state bank* may elect to dissolve voluntarily and wind up its affairs by the act of the bank in the following manner *** [upon adopting a resolution recommending that the bank be dissolved voluntarily, attaching] [a]n executed copy of the contract *** with *** *another bank*." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 17, par. 380.

In finding that the trial court erroneously concluded that the

savings and loan was not "another bank" under this dissolution section, this court noted that where an act defines its terms, those terms must be construed according to the definitions in the act, and there is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute imports. (*Heritage Bank*, 132 Ill. App. 3d at 973, 478 N.E.2d at 529.) We rejected the argument that if "another bank" were not read as "another state bank," the word "another" would be meaningless or superfluous.

■ In the case at bar, the legislature has given the term "Director" a specific definition. Its inclusion of "or his designee" in the definition of "Director" recognizes that the Director of an agency cannot possibly perform all of the functions of the agency. Contrary to Moon Lake's assertion, it is not clear that the legislature intended to deviate from this principle by placing specific eligibility requirements on hearing officers.

Our conclusion is strengthened by the fact that the legislature, after the circuit court's decision in this case, amended section 3—704(a) by replacing the expression "duly qualified employee of the Department" with the word "person" (Pub. Act 85—1183, eff. August 13, 1988 (amending Ill. Rev. Stat. 1987, ch. 111½, par. 4153—704(a))), thereby permitting any person designated in writing by the Director to serve as a hearing officer. We do not believe this amendment demonstrates a change in attitude, but reflects the legislature's original intent in this matter. See *People v. Youngbey* (1980), 82 Ill. 2d 556, 563, 413 N.E.2d 416, 420.

Because we hold that White satisfied the statutory requirements as a "designee" of the Director, we need not address IDPH's final argument that White was a *de facto* officer whose acts are valid.

The next issue before us is whether the statutory time frames within which IDPH is to make a determination about a complaint are mandatory or directory. The circuit court found that IDPH had no jurisdiction to proceed against Moon Lake because it failed to determine the alleged violations within the time limits of the Act. At the time of IDPH's investigation of this matter, section 3—702(d) of the Act provided:

"A determination about a complaint which alleges a Type A violation *shall* be made by the Department, in writing, within 7 days after the complaint's receipt. A determination about a complaint which alleges a Type B or C violation *shall* be made by the Department, in writing, within 30 days after the complaint's receipt. The determination shall state the reasons

therefor." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 111½, par. 4153—702(d).[1]

The initial complaint here was received by IDPH on November 16, 1983, yet it did not issue its notice of complaint findings and determination that Moon Lake had committed one Type "A" and several Type "B" and "C" violations until March 12, 1984.[2] IDPH concedes that it did not comply with either the 7-day or 30-day time frames set forth in section 3—702(d), but it argues that section 3—702(d)'s time frames are merely directory.

■ Under Illinois case law, while the use of the word "shall" or "must" in statutory provisions is generally regarded as mandatory, the term "shall" can be construed flexibly to mean "may," depending on the legislative intent. (*Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21, 373 N.E.2d 1332, 1335; *Grove School v. Department of Public Health* (1987), 160 Ill. App. 3d 937, 941, 513 N.E.2d 973, 976.) However, where the protection of an intended class depends upon giving a mandatory meaning to the word, it cannot be given a permissive meaning (*Andrews*, 71 Ill. 2d at 21, 373 N.E.2d at 1335; *Grove School*, 160 Ill. App. 3d at 941, 513 N.E.2d at 976), although to properly interpret a statute a court must also consider the nature, object and consequences of construing it one way as opposed to another. *Andrews*, 71 Ill. 2d at 21, 373 N.E.2d at 1335; *Grove School*, 160 Ill. App. 3d at 941, 513 N.E.2d at 976; *Youngbey*, 82 Ill. 2d at 562, 413 N.E.2d at 421.

■ Our analysis under the above principles leads us to conclude that the section 3—702(d) time frames are directory rather than mandatory. The primary purpose of the Act undoubtedly is to protect nursing home residents. The legislature promulgated the Act amid

---

[1]This section of the Act was subsequently amended by Public Act 83—1530, effective July 1, 1985, to provide that Type "A" complaints must be "investigated" in seven days (except within 24 hours where a resident's life or safety is in imminent danger), and Type "B" and "C" violations must be "investigated" in 30 days. The amendment also requires all complaints to be classified, and for those classified as valid reports, IDPH must determine within 30 working days whether any rule or provision has been violated. Pub. Act 83—1530, eff. July 1, 1985 (amending Ill. Rev. Stat. 1983, ch. 111½, par. 4153—702(d)).

[2]The Act defines a "Type A" violation as one which creates a condition or occurrence presenting a "substantial probability that death or serious mental or physical harm to a resident will result." (Ill. Rev. Stat. 1985, ch. 111½, par. 4151—129.) It also classifies a condition or occurrence directly threatening the health, safety and welfare of a resident as a "Type B" violation, while one that does so indirectly is classified as a "Type C" violation. Ill. Rev. Stat. 1985, ch. 111½, pars. 4151—130, 4151—131.

concern over reports of inadequate and degrading treatment of nursing home residents. (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 357-58, 489 N.E.2d 1374, 1377; 81st Ill. Gen. Assem., Senate Proceedings, May 14, 1979, at 184 (statement of Senator Kare Berning).) While we acknowledge that prompt notice and determination by IDPH is important to nursing home facilities,[3] our focus in construing the Act is on the legislature's intent and the consequences to nursing home residents, the Act's intended protected class.

The consequences of a mandatory interpretation on nursing home residents are somewhat obvious. Such a finding could result in many unaddressed resident abuses, as one can envision a myriad of circumstances and events which may cause delay. A mandatory construction would also place IDPH in a position of having to file potentially incomplete and inaccurate determinations or be forever barred from proceeding. Moreover, it would encourage facilities to obscure issues and delay in providing necessary information. We find that the legislature could not have intended such a result.

While we agree that prompt action by IDPH is important to ensure that conditions which threaten the residents' health and safety are corrected, we do not believe that the protection of the residents depends upon a mandatory interpretation. Such a construction would be more injurious to residents than the benefits the residents would receive. As the court in *Grove School*, in finding section 3—704's time frames for commencing hearings on violations to be directory, succinctly stated:

> "[T]he legislative purpose of the Act is to protect nursing home residents from acts of abuse. The rights of these people will be far more adversely affected if defendant is unable to address charges of abuse because of a mandatory interpretation of the statute which would result in a dismissal of the proceeding, than they would be by a hearing delay." *Grove School*, 160 Ill. App. 3d at 941, 513 N.E.2d at 976.

Moon Lake distinguishes *Grove School* on the ground that the

---

[3]Moon Lake argues that prompt notice and determination are essential to nursing home facilities since fines can accrue under the Act from the discovery date until the date a violation is corrected or a plan of correction is filed by the home. (Ill. Rev. Stat. 1983, ch. 111½, par. 4153—305.) The Act has been amended subsequent to the administrative proceedings in this case to limit the assessment of fines from the date of service of notice of violation rather than the date of discovery of a violation. Pub. Act 85—1378, eff. September 1, 1988 (amending Ill. Rev. Stat. 1983, ch. 111½, par. 4153—305).

time requirements were in the period after the issuance of the complaint, at a time when the facilities had notice and opportunity to correct. It contends that, unlike the delay here, the delay in *Grove School* did not hurt the residents by continuing to expose them to potentially dangerous conditions. We do not believe the fact that the delay occurred at different stages mandates a different outcome, as both delays occurred before final action could be taken against the facilities, either by revoking their licenses or imposing penalties.

Nor do we find persuasive Moon Lake's contention that *Springfield-Sangamon County Regional Plan Comm'n v. Fair Employment Practices Comm'n* (1978), 71 Ill. 2d 61, 373 N.E.2d 1307, is more analogous to the case at bar because it involves the time frame under which an agency must issue its complaint. In *Springfield-Sangamon*, the Illinois Supreme Court considered whether the Fair Employment Practices Commission had jurisdiction to issue a complaint against an employer after the 180-day time period given in the statute. Holding the time limit mandatory, the court stated:

> "Certainly, periods of inaction on behalf of the FEPC would tend to hamper the remedial and reconciliatory procedures which underlie the very purpose of the Fair Employment Practices Act, and should the FEPC find against the respondents the financial burden of the administrative order could be substantially increased by virtue of any extended delay. Consequently, the 180-day period prescribed in the statute was intended to ensure expeditious action on behalf of the FEPC, and must be considered mandatory." *Springfield-Sangamon*, 71 Ill. 2d at 68, 373 N.E.2d at 1310.

*Springfield-Sangamon* is clearly distinguishable from the case at bar. As the above language indicates, the underlying purpose of the Fair Employment Practices Act is to encourage remedial and reconciliatory procedures. Unlike the instant case, a directory construction in *Springfield-Sangamon* would be injurious to the statute's purpose and a mandatory construction necessary to preserve its purpose.

■ We next address whether the license revocation proceedings were moot from their inception. The circuit court found that since Moon Lake surrendered its nursing home license before IDPH notified Moon Lake of its intent to revoke the license, the revocation was moot and the proceedings to revoke thereby void. On appeal, Moon Lake advances a number of arguments in its brief to support the circuit court's ruling, none of which are relevant to the mootness issue. An issue is moot if no actual controversy exists or where events occur which make it impossible for the court to effectively grant relief. (*Wheatley v.*

*Board of Education* (1984), 99 Ill. 2d 481, 484-85, 459 N.E.2d 1364, 1366; *People v. Lynn* (1984), 102 Ill. 2d 267, 272, 464 N.E.2d 1031, 1034.) Illinois courts have found exceptions to the mootness doctrine where there is substantial public interest involved or where the issues are likely to recur but unlikely to last long enough to allow appellate review to occur. (*Wheatley*, 99 Ill. 2d at 485, 459 N.E.2d at 1367.) It is unnecessary for us to consider IDPH's alternative contention that these exceptions apply because we agree with IDPH that an actual controversy existed here.

IDPH contends that an actual controversy existed, despite the surrendering of Moon Lake's license, to the extent that Moon Lake, an entity still in existence on September 10, 1987, was barred from obtaining a license for the five years after its license was revoked. Section 3—117 of the Act lists the revocation of a license during the previous five years as a ground for denial of a license. (Ill. Rev. Stat. 1983, ch. 111½, par. 4153—117(5).) Section 3—109 of the Act also provides:

> "[T]he Director shall issue a license if he finds: *** [t]hat [the entity] *** is a person responsible and suitable to operate or to direct or participate in the operation of a facility by virtue of financial capacity, appropriate business or professional experience, a record of compliance with lawful orders of the Department and lack of revocation of a license during the previous 5 years." Ill. Rev. Stat. 1983, ch. 111½, par. 4153—109(1).

The Illinois Supreme Court has addressed a similar issue in *Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231, 437 N.E.2d 638. The issue there was whether a taxpayer which had an overall loss in terms of Federal taxable income but a gain from municipal bonds under the Illinois income tax could enter a negative number as its taxable income or whether the figure it had to enter was "zero." After the appellate court ruled that the same deduction could not be taken twice, the taxpayer paid the amount of loss it had previously carried back to an earlier year. Although the supreme court recognized that the determination of the disputed question would determine whether the taxpayer could in future tax years carry back a Federal loss to offset earlier years' gains, it found no present controversy between the litigants since the Department of Revenue would have no greater *present* rights against the bank were it to receive the ruling it requested. *Madison Park*, 91 Ill. 2d at 235, 437 N.E.2d at 639.

The instant case is distinguishable from *Madison Park*. Here, the revocation of Moon Lake's license would affect Moon Lake's present status or rights in that it no longer would have the present ability to obtain a license by complying with the Act's conditions. IDPH, in turn,

would have a greater present right against the entity. Accordingly, we find that an actual controversy existed and the revocation proceedings were not moot.

Finally, we review the circuit court's holding as to the merits of this controversy. The circuit court commented on hearing officer White's findings in the administrative proceedings as follows:

> "The findings of neglect are against the manifest weight of the evidence as well as being capricious and arbitrary ***. The findings rest on untrue and unreasonable allegations that plaintiff's written bath procedures required the use of thermometers instead of human hands to determine whether bath water was in a comfortable range. All the testimony was to the contrary, and defendants twisted and distorted the written procedures to support the 'neglect' allegations. There was no competent evidence of the temperature or duration of the bath in which the resident may have suffered immersion burns, and substantial evidence that he was cared for by an attentive staff throughout."

At the administrative proceedings, White found that Moon Lake had committed six violations of the Rules: (1) an act of neglect, a type "A" violation of Rule 16.04.01.00 for fine of $1,000; (2) failing to follow its own resident care policies, two type "B" violations of Rule 03.01.01.00 for fines of $2,492.60 and $618; (3) the director of nurses failed to maintain the nursing standards of the facility, a type "B" violation of Rules 06.02.02.00 and 06.02.02.05 for a $618 fine; (4) failed to notify IDPH of the Ovitz incident within 24 hours as prescribed by Rule 09.01.06.00 for a $309 fine; (5) failed to have protective devices to ensure that water temperatures did not exceed 110 degrees, a type "C" violation of Rule 15.13.03.05 for a $309 fine.

■ On administrative review, the findings of fact made by an administrative agency are *prima facie* true (Ill. Rev. Stat. 1985, ch. 110, par. 3—110), and the reviewing court's inquiry is limited to ascertaining whether the agency's findings and decision are against the manifest weight of the evidence. *Sheehan v. Board of Fire & Police Commissioners* (1987), 158 Ill. App. 3d 275, 287, 509 N.E.2d 467, 471.

■ In defending the circuit court's reversal of the neglect violation, Moon Lake claims that the hearing officer improperly based its decision on the unsupported opinion of Nurse Whelan, who was the office nurse of White's parents for 17 years, that Moon Lake's policy required the use of thermometers. While it is true that Moon Lake's policy did not mention thermometers and Moon Lake's witnesses did not so interpret its policy, a review of the record reveals that the circuit court misapprehended the hearing officer's findings as to the neglect

violation. Rule 16.04.01.00 provides that "an owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident." "Neglect" is defined in section 1—117 of the Act as "a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical \*\*\* injury to a resident." (Ill. Rev. Stat. 1983, ch. 111½, par. 4151—117.) The essence of the neglect violation under these provisions was not Moon Lake's failure to have thermometers, but that its aide placed a resident in a bath causing his death because Moon Lake did not provide adequate personal care by taking adequate measures to protect its residents from accidents from excessive water temperatures.

Substantial evidence supports the neglect violation. First, IDPH sufficiently proved that a resident suffered physical injury from the personal care of Moon Lake. Contrary to the circuit court's finding that there was "no competent evidence of the temperature or duration of the bath in which a resident may have suffered immersion burns," IDPH presented substantial evidence showing that Ovitz was burned and ultimately died because of his immersion in bath water at the facility. It was undisputed that Ovitz had no burns on his body before his bath that morning and that Ovitz suffered third degree burns over 40% of his body on that day, requiring emergency attention and hospitalization and ultimately causing his death. Ovitz' treating physician at Evanston Hospital testified that Ovitz' burns were caused by immersion in a discrete body of water such as a tub bath, that water temperatures must minimally measure between 106 and 109 degrees to cause third degree burns, and that although the elderly's skin burns more easily, the early crusting of Ovitz' skin indicated to him that the water temperature in Ovitz' bath exceeded 120 degrees.

Substantial evidence was also introduced showing that Moon Lake did not provide adequate personal care or maintenance to Ovitz, resulting in his death. Facilities are required to have written procedures governing all services to its residents. (Rule 13.01.01.00.) Moon Lake's bathing policy, "Prevent accidents—do not make water too hot (95 degrees to 100 degrees F.)," indicates it recognized the importance of safe water temperatures with elderly residents who are susceptible to burns. Moon Lake's daily temperature logs for November 1983 also indicate that it knew that the water temperature in its system at times fluctuated above its bathing policy, at times exceeding 110 degrees. Yet, Moon Lake failed to take adequate measures to protect elderly residents from accidents from excessive water temperatures.

This evidence is likewise sufficient to establish violations of Rules 03.01.01.00 and 06.02.02.05. Rule 06.02.02.05 provides that the direc-

tor of nurses shall oversee the nursing services and develop and maintain standards of nursing practice and written policies. The director of nurses here violated her duty to maintain standards of nursing practice by not following its own bath policy in failing to develop standards to prevent accidents from excessive temperatures. Similarly, Moon Lake violated Rule 03.01.01.00, which requires that facilities follow their written policies and procedures governing all services provided by the facility, by failing to provide an adequate means for its employees to follow its policy of preventing accidents to ensure that the water temperatures did not exceed 100 degrees.

■■■ In addition to the above violation of Rule 03.01.01.00, the hearing officer found a second infraction of this rule for leaving Ovitz unattended in his bath in violation of written policy. Moon Lake's bathing policy requires the aide to remain with the resident while the resident is in the bath. As Moon Lake points out, the policy does not prohibit an aide from leaving momentarily if the resident is not in the tub. The only evidence introduced by IDPH was testimony from Detective Syre that Deere stated he left the bath area to fetch a towel. The record is devoid of evidence showing at what point Deere left the bath area or that Ovitz was in the tub at the time. Thus, the trial court correctly found the hearing officer's finding as to this violation to be against the manifest weight of the evidence.

As to the hearing officer's finding of a late notification and its assessment of a penalty for that infraction, the evidence indisputably showed that Moon Lake did not notify IDPH of the Ovitz incident within 24 hours as required by Rule 09.01.06.00. Nonetheless, Moon Lake argues that this infraction should not have been a basis for a penalty assessment because no violation level is assigned to the rule and the Act only authorizes penalty assessments for "A," "B" and "C" violations. IDPH responds that in failing to assign a specific "type" violation to this rule, the legislature recognized that the seriousness of a failure to promptly report an incident would vary depending upon the seriousness of the incident.

■■■ Prompt reporting of incidents and accidents is vital to the protection of the residents remaining in the facility where the incident occurred. We find nothing in the Act that prohibits a penalty for late notification. Section 3—305 outlines the penalties for "A," "B," and "C" violations, but also provides "the license of a facility which is *in violation of this Act or any rule adopted thereunder* may be subject to the penalties or fines levied by the Department." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—305.) We, therefore, find the hearing officer did not err in assessing a penalty for this violation.

██ The hearing officer assessed the last penalty against Moon Lake for its failure to have protective measures implemented to "ensure" that water temperature does not exceed 110 degrees in violation of Rule 15.13.03.05.[4] The evidence showed that water temperatures exceeded 110 degrees on February 1, 1985. Moon Lake asserts that it had a mixing valve and daily water temperature checks as suggested in the rule and that, after the temperature rose above 110 degrees during the February 1 inspection, the maintenance supervisor adjusted it. The rule, however, requires Moon Lake to implement protective measures to "ensure" that the water temperature does not exceed 110 degrees. We agree with IDPH that the fact that water temperatures exceeded 110 degrees on February 1, 1985, is overwhelming evidence that Moon Lake's measures did not "ensure" temperatures would not exceed 110 degrees.

Accordingly, we hold that the circuit court erred in finding the hearing officer's findings as to all violations except that relating to Ovitz' unattended bath to be against the manifest weight of the evidence.

██ In view of our above findings, it is apparent that the circuit court erred in awarding section 2—611 fees. (Ill. Rev. Stat. 1985, ch. 110, par. 2—611.) IDPH's allegations were not "untrue," as they were supported by substantial evidence.

For the foregoing reasons, we reverse the circuit court's order setting aside the decision of the Director of IDPH, and we reinstate the order revoking Moon Lake's license and imposing fines for all violations found by the Director except the $618 fine for violation of Rule 03.01.01.00.

Affirmed in part; reversed in part.

CAMPBELL and O'CONNOR, JJ., concur.

---

[4] Rule 15.13.03.05 was promulgated on November 15, 1983, after the Ovitz incident.