SPRINGWOOD ASSOCIATES, d/b/a Maplewood Health Care Center, Plaintiff-Appellant, v. JOHN R. LUMPKIN, Director of the Department of Public Health, Defendant-Appellee.

Fourth District   No. 4—92—0325

Opinion filed December 30, 1992.

Daniel Maher, of Stratton, Dobbs & Nardulli, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Springwood Associates (Springwood) owns and operates the Maplewood Health Care Center (Maplewood), a private nursing home licensed and regulated by the Department of Public Health (Department) pursuant to the Nursing Home Care Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—101 *et seq.*). During the course of an annual inspection, the Department made findings that Springwood failed to meet the minimum standards prescribed by the Department. On review of the findings, the Department issued two Type B violations (see 77 Ill. Adm. Code §300.274(b)(2), at 2697 (1991)) and eight administrative warnings (see 77 Ill. Adm. Code §300.277, at 2699 (1991)). Springwood contested the issuance of one of the Type B violations dealing with the availability of water in excess of 110 degrees Fahrenheit at shower, bathing and handwashing facilities. (77 Ill. Adm. Code

§330.3130(c)(4), at 2817 (1991) (eff. Mar. 24, 1989).) A hearing officer found the Type B violation was appropriate. Associate Director Bell adopted the finding of the hearing officer. Springwood sought administrative review in the circuit court of Sangamon County, which affirmed the decision of the Department.

Springwood appeals, raising two arguments: (1) the Department of Public Health cannot issue a violation against a nursing home for a violation of the Act, absent negligent conduct on the part of the facility (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—117); and (2) the Department violated its own regulations because Springwood was not afforded the opportunity to review a proposed order and submit written exceptions and a brief before the Associate Director, who had reviewed the record, issued a final decision. Both arguments are unpersuasive in light of applicable statutes, regulations, and case law. We affirm the circuit court.

■ The Act provides private nursing homes must be licensed by the Department. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—102.) The Department is authorized to develop a comprehensive system of licensure of nursing homes (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—101), required to provide minimum standards for nursing homes (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—202), and empowered to adopt rules and regulations in order to carry out the purposes of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—801).

The Department is required to conduct annual inspections of nursing homes to ensure compliance with applicable licensure requirements and standards. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(a).) The inspections are conducted by Department sanitarians. When the sanitarian discovers failures on the part of a nursing home to comply with applicable requirements and standards, he or she makes notations of the failures in a report. Upon completion of each inspection, the sanitarian must submit a copy of the report to the nursing home and the original to the Department. The nursing home may, within 10 days, provide comments or documentation refuting findings in the report, explaining extenuating circumstances which the nursing home could not have prevented, or indicating methods and timetables for correction of deficiencies described in the report. Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(c).

The Department must then determine whether the report's findings constitute a violation of which the facility must be given notice. This determination is based upon a list of criteria, set forth in both the Act and the regulations. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(c); 77 Ill. Adm. Code. §300.272(c), at 2696 (1991).) If the is-

suance of a violation is warranted, the next step is to determine the level of the violation. 77 Ill. Adm. Code §300.274, at 2696-98 (1991).

There are two levels of violations defined by the Act. (See Ill. Rev. Stat. 1989, ch. 111½, pars. 4151—129, 4151—130; see also 77 Ill. Adm. Code §300.274(b), at 2697 (1991).) A "Type A violation" is a more serious violation than a "Type B violation." In determining the level of the violation, the Department must consider (1) the designated level of the violation in the regulation, (2) the degree of danger posed by it, and (3) the directness and imminence of the danger to the residents. (77 Ill. Adm. Code §300.274(c), at 2697 (1991).) The degree of danger and its directness and imminence to residents are determined by applying a list of criteria set forth in the regulations. 77 Ill. Adm. Code §§300.274(c)(2), (c)(3), at 2697-98 (1991).

● 2 After the level of the violation is determined, the nursing home must be provided with a notice of violation. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—301.) If the nursing home wishes to contest any Department action, it must send a written request for a hearing to the Department within 10 days of receipt of the contested action. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—303(e).) Upon receipt for a request for a hearing, the Director or hearing officer must conduct a hearing to review the action. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—704(a).) After the hearing, the Director or hearing officer must make findings of fact. When the hearing has been conducted by a hearing officer, the Director must review the record and findings of fact before rendering a decision. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—707.) If the Director does not either preside at the hearing or review the record, and the decision is adverse to any party other than the Department, the Director must provide all parties with a copy of the proposed decision and the party which will be adversely affected must be afforded an opportunity to file written exceptions and a brief. (77 Ill. Adm. Code §§100.14(c), 100.15, at 2347-48 (1991).) "Director" is defined by both the Act and the regulations as the named Director of the Department, or his designee. Ill. Rev. Stat. 1989, ch. 111½, par. 4151—110; 77 Ill. Adm. Code §100.2, at 2337 (1991).

In the present case the annual inspection of Maplewood was conducted on September 6 and 7, 1990, by Department sanitarians Pat Fisher and Stephen Mott. Fisher and Mott made findings of 10 failures to comply with applicable standards and regulations. One of the findings resulted from Fisher's discovery of water temperatures in excess of 110 degrees Fahrenheit in five locations on September 6 and three locations on September 7.

Fisher testified that, on September 6, she discovered water temperatures ranging from 124 to 128 degrees. She notified the maintenance supervisor, Melvin Grover, that the water temperatures were too high. Fisher further testified that when she took the water temperatures again on the morning of September 7, she discovered water temperatures of 132 degrees in two locations and a temperature of 115 degrees in one location. Fisher notified Lisa Hernadez, the administrator, and informed her the water needed to be turned off until the problem could be fixed.

Mott testified he was with Fisher when she discovered the high temperatures. Both Fisher and Mott testified the locations of the excessive water temperatures were in heavily trafficked areas of the nursing home; additionally, the residents were ambulatory and appeared confused. Fisher and Mott heard no announcements warning of the hot water; no signs were posted and the access to the areas was not restricted. Both Fisher and Mott testified the problem had been fixed or the system shut down, before they left on September 7. The sanitarians testified they could not have left the facility if the water temperatures continued to exceed 130 degrees. Fisher additionally testified she had informed both Hernandez and Grover that the sanitarians could not leave until the problem had been addressed.

Grover testified he worked five days a week at Maplewood, taking and recording the temperatures throughout the nursing home on the days he worked. Grover testified he checked the water temperatures on the mornings of September 6 and 7, and the temperatures were not in excess of 110 degrees. Grover accompanied Fisher and Mott on September 6 and was present when Fisher discovered the excessive temperatures in several locations. Grover checked the temperatures after Fisher, and his thermometer also registered excessive temperatures. Grover testified he made adjustments to the water heater in Fisher's and Mott's presence, and 15 minutes later both he and Fisher rechecked the temperatures, which had fallen to 104 degrees. Fisher and Mott have no recollection of witnessing adjustments to the water heater or rechecking temperatures on September 6. Grover additionally testified that on September 7, he shut off the water when instructed to do so by the sanitarian or administrator and placed a sign on the door.

Hank Koolanki, a supervisor at Capes and Son, testified an electrician from Capes replaced the mixing valve on a water heater at the nursing home on September 7, 1990. Koolanki testified it is impossible to know in advance that a mixing valve is going to break. The first sign of a problem is fluctuation in water temperature.

Fisher and Mott provided Lisa Hernandez, the administrator, with a copy of their findings before leaving Maplewood. Hernandez provided comments to the Department. Mott made additional comments and recommended a Type B violation be issued. All of the information was then sent to Springfield, where it ultimately went to the Department's quality assurance division.

George Madden testified he worked in the Department's quality assurance division. Madden testified he reviewed the findings and other material, and in accordance with the procedures outlined in the regulations, determined there was a violation and the violation was a Type B violation.

Notice of violation was sent to Springwood, along with notices of violations and administrative warnings regarding nine other findings. Springwood filed a request for a hearing. Originally Springwood contested all of the violations and administrative warnings; however, prior to the hearing, Springwood withdrew its request for a hearing on all issues except the Type B violation issued for the availability of water in excess of 110 degrees. Hearing Officer Margaret O'Grady presided over the hearing and issued a recommended decision finding the Type B violation was appropriate. After reviewing the record, Associate Director William Bell adopted the findings and recommendations of the hearing officer. Springwood sought review in the circuit court of Sangamon County. The circuit court affirmed the decision of the Department. This appeal followed.

■ Springwood argues it cannot be issued a violation for its failure to meet the minimum standards promulgated under the Act unless the Department shows Springwood's failure to meet the minimum standards was negligent. In support of its position, Springwood cites two tort cases in which a resident of a nursing home filed suit against the facility alleging negligence on the part of the facility. Springwood's reliance on these cases is misplaced as they deal with a negligence cause of action, rather than a nursing home's failure to meet the minimum standards promulgated by the regulatory agency. We are unaware of any authority for the extension of the negligence analysis to violations of the regulations of a regulatory agency. Moreover, examination of the Act and regulations reveal no intent to implement a negligence analysis in the case of regulatory violations. Hence, we reject Springwood's argument and affirm the decision of the circuit court.

The Act was enacted as a result of concerns over reports of "inadequate, improper and degrading treatment of patients in nursing homes." (81st Ill. Gen. Assem., Senate Debates, May 14, 1979, at 184

(statement of Senator Karl Berning).) The purpose of the Act is to provide protection for nursing home residents. (*Moon Lake Convalescent Center v. Margolis* (1989), 180 Ill. App. 3d 245, 255, 535 N.E.2d 956, 963.) The Act provides two methods of implementing this goal. First, private nursing homes must be licensed and regulated by the Department. Second, nursing home residents are granted a private right of action against nursing homes for violations of the residents' rights (Ill. Rev. Stat. 1989, ch. 111½, pars. 4152—101.1 through 4152—113) under the Act (Ill. Rev. Stat. 1989, ch. 111½, pars. 4153—601 through 4153—604).

Pursuant to the licensure and regulations provisions, a private nursing home must be licensed by the Department, and must meet the minimum standards set forth by the Department. If the Department makes findings that the facility has failed to comply with the minimum standards, the facility is subject to administrative warnings or violations bearing civil penalties, and possibly license revocation. (Ill. Rev. Stat. 1989, ch. 111½, pars. 4153—301 through 4153—316, 4153—317.) Intentional failure to correct violations within a specified period of time may result in criminal penalties. See Ill. Rev. Stat. 1989, ch. 111½, par. 4153—318(c).

■ The Act additionally provides residents with a private right of action against the nursing home. The private right of action is a recognition of the concept of a "private attorney general." The legislature realized the Department cannot daily police every nursing home and detect every violation of the Act. Nursing home residents themselves are in the best position to know of and seek redress for violations. (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 369, 489 N.E.2d 1374, 1382.) Thus, the nursing home residents are granted a statutory action against nursing homes for violations of their rights (Ill. Rev. Stat. 1989, ch. 111½, pars. 4153—602 through 4153—604), and the ability to seek treble damages (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—602), as an incentive to the residents to seek legal redress.

The two cases cited by plaintiff do not involve regulatory violations by a nursing home; rather, they are negligence actions filed by residents against the nursing homes where they resided. *Owens v. Manor Health Care Corp.* (1987), 159 Ill. App. 3d 684, 512 N.E.2d 820, was apparently a common law negligence action, and *Harris* was an action filed under the provisions of the Act providing a private right of action to residents.

In *Owens*, plaintiff filed a tort claim against the nursing home where he resided for failure to provide adequate supervision and care.

The issue before the appellate court was whether this case was a healing art malpractice case. The court determined it was not. Since the plaintiff alleged acts of negligence on the part of the nursing home, the cause of action was one sounding in ordinary negligence. *Owens*, 159 Ill. App. 3d at 689, 512 N.E.2d at 823-24.

In *Harris*, plaintiff filed a claim, under the private right of action provisions of the Act, against the nursing home, for injuries received due to the nursing home's neglect while she was a resident. The issue before the court was whether the provision permitting plaintiffs to recover treble damages was a violation of due process, because it permitted the recovery of treble damages for negligent conduct. The court concluded the Act did allow for treble damages for negligent conduct, because neglect is defined as the failure to provide adequate care, and adequate care is the standard of care used in a negligence analysis. (*Harris*, 111 Ill. 2d at 367, 489 N.E.2d at 1381.) However, the court did not find there to be a violation of due process. *Harris*, 111 Ill. 2d at 370, 489 N.E.2d at 1383.

Plaintiff alleges that *Owens* and *Harris* define the standard of care owed by the nursing home to its residents as one of ordinary care. Thus, plaintiff alleges, the Department cannot issue a violation to the nursing home unless the Department finds negligence on the part of the nursing home. Plaintiff's argument fails to recognize the distinction between a regulatory violation and a tort action. Moreover, negligence is implicit in the causes of action set forth in *Owens* and *Harris*. In *Owens*, plaintiff alleged negligence; in *Harris* plaintiff alleged neglect, and, as the court determined, negligence is inherent in the definition of neglect. In the present case, Springwood has not been sued for negligence or neglect, nor has Springwood been issued a violation for negligent or neglectful conduct. Springwood has been issued a regulatory violation due to its failure to meet the minimum standards, not related to negligent conduct, promulgated by the Department.

Unlike the causes of action in *Owens* and *Harris*, negligence is not inherent in the regulation violated by Springwood. As defendant correctly asserts, neither the Act nor the regulations require the Department prove the nursing home negligently violated the regulations. The Act provides the Department is to prescribe minimum standards (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—202), and must inspect the facility not less than annually to determine whether the facility is in compliance with the minimum standards (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(a)). A failure of the nursing home to comply with the minimum standards is noted in a report; whether the failures

constitute violations is determined, not under a tort analysis, but under a specified list of criteria. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(c); 77 Ill. Adm. Code §300.272, at 2695-96 (1991).) Furthermore, the regulation which Springwood violated provided "[h]ot water available to residents at shower, bathing and handwashing facilities shall not exceed [110] degrees Fahrenheit." (77 Ill. Adm. Code §300.3130(c)(4), at 2817 (1991); see 13 Ill. Reg. 4684, 4903 (eff. Mar. 24, 1989).) Notably the regulation does not provide the nursing home must use "adequate care" to ensure water temperatures do not exceed 110 degrees. Rather, the regulation provides the water temperatures "shall not" exceed 110 degrees. Thus, negligence is not an element of the regulation violated by Springwood.

Plaintiff also seeks support for his argument in the Department regulations providing that whether the violation is a Type A or Type B violation involves consideration of a list of factors, one of which is whether the condition resulted from the negligence or engagement in ultrahazardous activities on the part of the facility. Plaintiff argues this demonstrates the Department's own regulations indicate it may not issue a violation to a nursing home unless the facility has been negligent. This argument is also unpersuasive.

First, the consideration of whether the facility was negligent is not a factor in determining whether a violation has occurred. After the Department has determined a violation exists, the Department then considers the negligence or lack of negligence of the facility in determining the level of a violation. Since the negligence inquiry does not occur until *after* it has been determined that a violation exists, it cannot be a *prerequisite* to a finding of a violation. Second, a finding of negligence is not a necessary finding at any part of the process; rather, the existence or lack of negligence on the part of the nursing home is merely *one factor*, among several, which may be used to determine whether the nursing home has committed a Type B violation, or the more severe Type A violation. Had Springwood been issued a Type A violation, it could have argued its alleged lack of negligence weighed in favor of assessing a Type B violation rather than a Type A violation. Such an argument is unnecessary in the present case, as Springwood was issued the less severe, Type B violation.

Plaintiff's innovative argument aside, the issue before this court is essentially whether the Department properly determined a violation existed, and whether that violation was properly classified as a Type B violation.

On administrative review, the findings of fact made by the administrative agency are *prima facie* true, and they will not be disturbed

unless they are against the manifest weight of the evidence. (Ill. Rev. Stat. 1991, ch. 110, par. 3—110.) In the present case the circuit court affirmed the decision of the agency. The question before this court is whether the circuit court erred by not finding the Department's decision was against the manifest weight of the evidence. In the hearing conducted by the Department, evidence was taken regarding the uncontroverted facts that the temperatures were in excess of 110 degrees on September 6 and 7, Springwood's history of excessive temperatures, and Springwood's remedial efforts.

The Department introduced evidence at the administrative hearing demonstrating the application of the regulations to the facts of this case indicated a violation occurred. The determination of whether the nursing home's failure to comply with the minimum standards set forth in the Act and regulations constitutes a violation does not involve a negligence analysis. Rather, both the Act and the regulations provide a list of criteria to be used in determining whether a violation exists. According to the Act and the regulations, this determination is based on the severity of the finding, the danger posed to the resident's health and safety, the comments and documentation provided by the nursing home, the diligence and efforts to correct deficiencies, correction of the reported deficiencies, the frequency and duration of similar findings in previous reports, and the nursing home's general inspection history. Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(c); 77 Ill. Adm. Code §300.272(c), at 2696 (1991).

In the present case, the Department considered the criteria set forth in determining whether a violation had occurred. The record reflects the Department has conducted research and has determined water temperatures in excess of 110 degrees pose a danger to residents of nursing homes, who, due to their age, have thin epidermal layers and are more susceptible to thermal burns. Additionally, the recovery process from burns is longer in the case of elderly people. Madden, the Department member who reviewed the findings, considered the level of the temperature and the fact that no one was actually injured. In determining the danger posed to the residents, Madden considered the residents' access to the area and the fact they were ambulatory and confused. Madden did not remember whether Springwood submitted comments in this case; however, if the comments were submitted, Madden testified he would have considered them. Madden additionally testified he considered the history of the facility noting that the Department made findings of temperatures in excess of 110 degrees at Maplewood on March 1, and August 1, 1989. Based on this criteria, Madden determined a violation should be issued.

The evidence introduced at the administrative hearing also indicated an application of the regulations to the facts of this case demonstrated the violation was a Type B violation. A "Type A violation" is a violation which creates a condition or occurrence relating to the operation and maintenance of a nursing home presenting a substantial probability that death or serious mental or physical harm to a resident will result. (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—129; 77 Ill. Adm. Code §300.274(b)(1), at 2697 (1991).) A "Type B violation" is a violation which creates a condition or occurrence relating to the operation and maintenance of a nursing home directly threatening to the health, safety or welfare of a resident. (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—130; 77 Ill. Adm. Code §300.274(b)(2), at 2697 (1991).) In determining the level of the violation, the Department must consider the designated level of the violation in the regulation, the degree of danger to the residents, and the directness and imminence of the danger to the residents. 77 Ill. Adm. Code §300.274(c), at 2697-98 (1991).

The degree of danger is determined by assessing the residents' ability to recognize the danger and take self-protective measures, the accessibility of the area of the nursing home where the condition exists, including whether the nursing home erected barriers, notices, or otherwise restricted resident access to the area, whether the condition or occurrence was the result of inherently dangerous activities or negligence by the facility, and whether the facility notified the residents of the condition. 77 Ill. Adm. Code §300.274(c)(2), at 2697-98 (1991).

The directness and imminence of the danger is determined upon consideration of whether actual harm occurred, whether statistics and records from similar facilities indicate direct and imminent danger has resulted from similar conditions or occurrences and the frequency of such danger, whether professional opinions and findings indicate direct and imminent danger will result from the condition or occurrence, whether the condition or occurrence was limited to a specific area, including whether the facility took steps to limit or reduce the scope of the area affected, and whether the physical, mental, or emotional state of the residents subject to the danger would facilitate or hinder harm actually resulting from the condition or occurrence. 77 Ill. Adm. Code §300.274(c)(3), at 2698 (1991).

In the present case, Madden testified he used regulation 300.274 to determine the level of the violation. (77 Ill. Adm. Code §300.274, at 2694-96 (1991).) The regulations indicate a violation of the provision regarding hot water temperatures may be either a Type A or Type B violation. See 77 Ill. Adm. Code §300.3130, at 2818 (1991).

In determining the degree of danger, Madden considered that due to the residents' confusion and the lack of warnings regarding the hot water, the residents were unable to recognize the danger and take self-protective measures. Additionally, the residents had access to the area where the water temperatures were in excess of 110 degrees. Madden concluded the facility was negligent because the violation existed for two days, and at the time when the sanitarian found the excessive water temperatures on the second day, the facility still had not restricted access to the area. Finally, the residents were not notified of the condition.

In determining the directness and imminence of the danger, Madden considered the fact that no injury had occurred, and statistics from other facilities indicating there had been other Type B violations issued under similar circumstances. Madden additionally testified he relied on the opinions of the sanitarians as professional opinions. Finally, Madden testified he found the problem to be fairly localized. Based upon these criteria, Madden determined a Type B violation was appropriate.

The hearing officer made findings of fact at the conclusion of the evidence. The hearing officer found on both September 6 and 7, there were locations where the water temperature was in excess of 110 degrees. Although the maintenance supervisor or the administrator was notified on each of the occasions, the areas remained accessible to the residents. No announcements were made and no notices were posted. On September 6, the maintenance supervisor, after being notified of the excessive temperatures, made an adjustment to the water heater. The hearing officer concluded the Department proved Springwood violated the rules and regulations prohibiting water temperatures in excess of 110 degrees, and under the criteria set forth in the regulations, the violation was appropriately determined to be a Type B violation. The Associate Director adopted the findings and recommendations of the hearing officer.

In the context of its negligence argument, plaintiff contends the issuance of a violation was inappropriate because the nursing home maintained daily temperature logs, which indicated there had been no temperatures in excess of 110 degrees in the three months prior to the inspection. Plaintiff additionally states that Springwood took immediate action once the excessive temperatures were discovered during the inspection. The maintenance supervisor made an adjustment to the water heater. On the second day of the inspection, when higher water temperatures were recorded, Springwood, at the Department's direction, shut down the hot water system until an electrician could

arrive to perform needed repairs. A similar argument was rejected by the appellate court in *Moon Lake* (180 Ill. App. 3d at 262, 535 N.E.2d at 967), in the case of a similar regulation.

In *Moon Lake*, the nursing home was issued a violation for failure to comply with a regulation requiring nursing homes to implement preventative measures to ensure water temperatures do not exceed 110 degrees. On appeal, Moon Lake argued a violation was inappropriate because the water temperatures were checked daily, an adjustment was made when the Department discovered excessive temperatures, and the water heater had a mixing valve. The appellate court rejected Moon Lake's argument, finding that the fact the water temperatures exceeded 110 degrees on the day of the inspection was compelling evidence that Moon Lake did not "ensure" temperatures would not exceed 110 degrees. (*Moon Lake*, 180 Ill. App. 3d at 262, 535 N.E.2d at 967.) The dictionary defines "ensure" as "to make certain or sure." American Heritage Dictionary 456 (2d ed. 1982).

Although the regulations in *Moon Lake* and the present case utilize distinct language, their effect is the same. The regulation in *Moon Lake* required nursing homes to make certain that water temperatures do not exceed 110 degrees and the regulation in the present case provided the water temperature shall not exceed 110 degrees. Both regulations obligate the nursing homes to provide only water which does not exceed the temperature of 110 degrees. The similarity of the regulations in both cases, and the appellate court's rejection of similar arguments in *Moon Lake*, lends additional support to our rejection of Springwood's argument that a violation is inappropriate in this case because it took preventive or remedial measures.

■ The preventative or remedial measures undertaken by the nursing home do not *per se* prevent the issuance of a violation. Rather, they are factors to be considered in determining whether a violation should be issued, and, if so, the level of the violation. In the present case the hearing officer heard testimony regarding Springwood's preventative and remedial measures. The hearing officer also heard testimony regarding Springwood's failure to restrict access to the area, or notify the residents of the danger. Testimony was additionally offered regarding the history of excessive temperatures at Maplewood. The hearing officer was in the best position to judge the demeanor and credibility of the witnesses and weigh these competing factors. Therefore, we find the Department's determination was not against the manifest weight of the evidence, and affirm the decision of the circuit court.

■ Springwood next argues the Department violated its own regulations because it was not provided with a copy of the proposed decision and an opportunity to file written exceptions and a brief before the Associate Director issued the Department's final decision.

The administrative rules promulgated pursuant to the Act provide that if the Director has not presided at the hearing or has not read the record of the proceeding and his final decision would be adverse to any party other than the Department, prior to the entry of a final order a proposed decision must be served on all parties to the proceeding and parties adversely affected must be afforded an opportunity to file written exceptions. (77 Ill. Adm. Code §§100.15(a),(c), at 2348 (1991).) There is no dispute that Director John R. Lumpkin did not preside at the hearing. Plaintiff alleges that since *Associate* Director William Bell issued the final decision after a review of the record, there is no evidence *Director* Lumpkin reviewed the record, thus plaintiff should have been provided with a copy of the proposed order and afforded an opportunity to file written exceptions and a brief. The resolution of this issue turns on the interpretation of the term "Director."

The Act defines "Director" as "the Director of Public Health or his designee." (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—110.) Similarly, the administrative rules, promulgated under the Act, define "Director" as "the Director or the designee of the Director of the Department of Public Health." (77 Ill. Adm. Code §100.2, at 2337 (1991).) The appellate court has stated the inclusion of "or his designee" in the definition of "Director" is a legislative recognition that the Director of an agency cannot possibly perform all of the functions of the agency. (*Moon Lake,* 180 Ill. App. 3d at 254, 535 N.E.2d at 962.) It is common practice for the Director of an agency to delegate specific responsibilities to a subordinate, during periods of unavailability of the director or for ongoing periods. *Hoardwood, Inc. v. Department of Public Aid* (1988), 175 Ill. App. 3d 432, 435, 529 N.E.2d 1009, 1012.

Construing the meaning of the word "Director" under the Act, the appellate court has noted, "[i]t is a fundamental rule of statutory construction that when an act defines its own terms, those terms must be construed according to the definitions given to them in the act." (*Beecher Medical Center, Inc. v. Turnock* (1990), 207 Ill. App. 3d 751, 754, 566 N.E.2d 445, 447.) Thus, the court determined that the definition of the term "Director" includes any designee of the named Director, regardless of whether the designee is an employee or non-employee of the Department. *Beecher,* 207 Ill. App. 3d at 754, 566

N.E.2d at 447-48; see also *Moon Lake*, 180 Ill. App. 3d at 254, 535 N.E.2d at 962.

Moreover, even in the absence of a statutory definition of the word "Director," the appellate court has interpreted "Director" to refer to the named Director of a department or his designee. In *Hoardwood* (175 Ill. App. 3d 432, 529 N.E.2d 1009), the appellate court determined that a statutory provision requiring the "Director" of the Department of Public Aid to make a final decision was satisfied where the final decision was made by the Executive Deputy Director. The court stated it would have been preferable for the legislature to define "Director" as "Director or his designee," with respect to the Director of the Department of Public Aid, as it had defined Director in such terms with respect to the Director of the Department of Public Health. However, the court concluded that even in the absence of a statutory definition, to define "Director" as meaning only the named Director of the Department would be contrary to the intent of the legislature. The court noted that the legislature had vested the authority to terminate or suspend the eligibility of a Medicaid provider with the Department of Public Aid generally, not specifically with the named Director. Thus, the court concluded, where a final decision by the "Director" was required, a decision by the designee of the Director was appropriate. *Hoardwood*, 175 Ill. App. 3d at 436, 529 N.E.2d at 1012.

Based upon the statutory definition of "Director," as well as the definition of "Director" appearing in the regulation, and the interpretive case law, it is clear the named Director or the designee of the named Director may make the final decision. The record is silent on whether Associate Director Bell was the designee of Director Lumpkin, and plaintiff does not present any argument that Bell was not Lumpkin's designee. The actions of an administrative agency are presumed to be correct unless evidence is introduced to the contrary. Thus, in the absence of evidence to the contrary, we presume Bell to be the designee of Lumpkin. Since the designee reviewed the record prior to issuing the final decision, the Department was not required to provide plaintiff with a copy of the proposed order and an opportunity to file exceptions and a brief. Therefore, we reject plaintiff's argument that the Department violated its own regulations, and affirm the decision of the circuit court.

Affirmed.

STEIGMANN, P.J., and LUND, J., concur.