EDWARD J. PRZISLICKI, Appellant, v. THE CITY OF CHICAGO, Appellee.

First District (5th Division)   No. 1—89—0982

Opinion filed March 28, 1991.—Rehearing denied May 21, 1991.

Louis B. Garippo, Susan G. Feibus, and Thomas A. Moore, all of Louis B. Garippo, Ltd., of Chicago, for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Moscovitch and L. Anita Richardson, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Appellant, Edward J. Przislicki, a bridgetender employed by appellee, the City of Chicago, sought administrative review after he was discharged by the city's personnel board for reporting to work under the influence of alcohol. The trial judge affirmed and Przislicki now appeals. We consider the following four issues: (1) whether the board's decision was invalid when it was not issued within 50 days of the hearing as required by its own rules; (2) whether the board admitted the result of Przislicki's blood-alcohol test without proper foundation; (3) whether the board improperly excluded evidence that the bridge in question was inherently unsafe; and (4) whether the board's decision was against the manifest weight of the evidence. For the following reasons, we affirm.

On April 14, 1987, at approximately 10:15 p.m., the driver of a taxicab was killed and two people were injured on the Kinzie Street bridge when Przislicki, the bridgetender on duty, raised and lowered the bridge to allow a boat to pass through.

After an investigation of the accident, the city's Department of Public Works (department) sought to discharge Przislicki from his employment for violating Personnel Rule XVIII, section 1, subsection 24, which prohibits reporting to work under the influence of alcohol. A hearing was held and Przislicki was discharged. We summarize below the relevant testimony from the hearing.

Przislicki testified that before he reported to work on April 14, he drank two 12-ounce bottles of beer between 6:50 p.m. and 8:15 p.m. Although he was not scheduled to work until 11 p.m., he arrived at the bridge house early, at 9:40 p.m., and relieved Bruno Lewandziewski.

At approximately 10:15 p.m., a boat requested passage through the bridge and, not seeing any vehicles or pedestrians, Przislicki raised and lowered the bridge. Przislicki stopped the lowering of the bridge when he saw a man on the bridge waving his arms. Someone on the boat's loudspeaker then told him to raise the bridge, which he did. Within a few minutes, police and fire department personnel arrived at the bridge and Przislicki called the department informing them there was a problem. Officials and other employees from the department soon arrived on the scene. Subsequently, Przislicki left the bridge house and saw that a taxicab had been crushed by the bridge. He realized that a driver must have been in the taxicab.

Several hours after the accident, Przislicki agreed to submit to a blood-alcohol test when he was told he would be fired if he refused. Przislicki was driven from the bridge to a hospital at approximately 2:30 a.m. The nurse swabbed his arm with a clear liquid and drew a blood sample. After receiving the results, Przislicki was driven back to his car and drove himself home.

Przislicki's wife, Patricia, testified that in her opinion, he was not intoxicated when he left for work that evening.

Lewandziewski, the bridgetender on duty before Przislicki, testified that when Przislicki relieved him at approximately 10 p.m., they spoke for 10 to 15 minutes. He did not smell alcohol on Przislicki's breath and did not observe anything unusual about him. In his opinion, Przislicki was not intoxicated at that time. However, he did not have an opinion as to whether he was under the influence of alcohol. Lewandziewski admitted that a bridgetender could be disciplined for turning over a bridge to another bridgetender who was intoxicated.

Louis Koncza, an engineer for the department, testified he arrived on the scene at approximately 11 p.m. and observed Przislicki after the accident. His face was flushed, he seemed nervous, his hands were shaking, and his steps were unsteady. Koncza thought Przislicki may have been drinking although he could have been under stress from the accident.

Deborah O'Malley, a news producer for WMAQ-TV, testified that she arrived on the scene shortly after the accident and spoke to Przislicki briefly at approximately 11:20 p.m. He looked shaken and there was a strong smell of alcohol on his breath.

Paul Karas, commissioner of the department, testified that he arrived at the bridge at approximately 11:30 p.m. and spoke with Przislicki. Przislicki appeared ruddy and dried out, his eyes were yellow, and it looked as if he had been drinking recently. Karas testified that when he was previously interviewed during the investigation of the accident, he stated that Przislicki did not appear intoxicated and he smelled of wintergreen not alcohol. He could not testify that Przislicki was sober. Przislicki initially refused to take a blood-alcohol test; however, Karas eventually told him that if he did not, he would be suspended without pay.

Chicago police officer John T. Burke, Jr., of the major accident investigation section, testified that he and his partner, Officer James T. Hopkins, interviewed Przislicki at 12:50 a.m. for approximately 25 minutes. Przislicki's speech was slurred, his face was red, and his breath smelled of alcohol. In Burke's opinion, Przislicki had been drinking but Burke could not testify that Przislicki was either sober or intoxicated.

Officer Hopkins, Burke's partner, testified that he also smelled alcohol on Przislicki's breath but he did not appear intoxicated.

Ron Magers, a news reporter for WMAQ-TV, testified that at approximately 2 a.m., he spoke with Przislicki and said, "it smells like you might have been drinking tonight." Przislicki responded that he had to be joking. Magers smelled alcohol on Przislicki's breath and his face was red, his eyes were bloodshot, and he was belligerent. Magers admitted that camera lights were shining in Przislicki's face at the time.

Ted Kaczkowski, a structural engineer for the city, testified that he drove Przislicki to the hospital for a blood-alcohol test. He did not inform the hospital's personnel that the results were to be used in court. After the test, he drove Przislicki back to his car and Przislicki drove himself home. Kaczkowski did not smell alcohol on Przislicki's breath and he did not show signs he was intoxicated. Kaczkowski did not have an opinion as to whether Przislicki was intoxicated.

Joyce Adelberg, a nurse at the hospital, testified she took a sample of Przislicki's blood at 2:43 a.m. following standard, routine, and customary procedure. She wiped his arm with betadine, a brown-colored nonalcohol solution, and drew the blood into a tube. She labelled the tube with Przislicki's name and social security number and sent it to the laboratory for analysis. At the time, she was only handling Przislicki's sample.

Adelberg testified that Przislicki did not show visible signs of intoxication because he was alert, did not slur his words, or have diffi-

culty walking. However, his breath smelled of alcohol. Before receiving the test result, Adelberg believed Przislicki had been drinking although he was not intoxicated. Based on the result of the test, however, she had the opinion that Przislicki was intoxicated. His blood-alcohol level was 152 milligrams per deciliter or .152% and the diagnosis was acute alcohol intoxication.

Carol Seguban, a medical technician working in the laboratory that morning, testified that the laboratory tested all the blood samples for the hospital. When she received Przislicki's blood sample, she prepared it for analysis by diluting it with an equal amount of distilled water. She tested the sample by running it with an alcohol reagent pack through an ACA machine. She handled Przislicki's sample in the standard and customary manner for the laboratory. Seguban also testified that at the beginning of every shift, a calibration pack was run through the ACA machine and a control pack was run every morning.

Lisa Cummings, a medical technologist also working in the laboratory, testified that the test was completed at approximately 3:30 a.m. She computed the result of Przislicki's blood-alcohol test from the ACA machine because Seguban was on break. Following standard procedure, she multiplied the result of the test, which was 76, by two to compensate for the dilution. The final result was 152. Blood samples were retained for two days after they were tested. In her two years of working in the laboratory, Cummings was not aware of any time that the ACA machine was inaccurately calibrated and she never had a test result invalidated.

Dr. Jorge del Castillo, an expert for the city, testified he was a senior attending physician in the emergency room for two hospitals. In his position, he dealt with patients who had alcohol-related illnesses. According to Dr. del Castillo, a blood-alcohol test would determine whether a person was under the influence of alcohol. He also testified that a person is under the influence of alcohol if he has one drink.

Based on the result of Przislicki's blood-alcohol test of .152 at 2:40 a.m., Dr. del Castillo gave an opinion of Przislicki's blood-alcohol level at 9:40 p.m., the time he reported to work. To achieve the result, Dr. del Castillo calculated the blood-alcohol level of .152 with accepted metabolism rates relevant to whether Przislicki was a light, moderate, or heavy drinker. If Przislicki was a light drinker, his blood-alcohol level at 9:40 p.m. would have been .200, if he was a moderate drinker it would have been .250, and if he was a heavy drinker, it would have been .300. This calculation was unreliable to the extent that Dr. del Castillo did not know Przislicki's exact metabolism rate.

Dr. del Castillo testified that based on the test result, Przislicki was under the influence of alcohol six hours earlier. With a blood-alcohol level of .152, a person would suffer some neurological impairment. However, without actually observing Przislicki, Dr. del Castillo could not say whether Przislicki was impaired at that time.

In discussing the differences between clinical and forensic settings, Dr. del Castillo testified that if the same bodily fluid and the same machine were used, the result would be the same in either setting.

Andrew H. Principe was an expert for Przislicki and executive director of the Northern Illinois Police Crime Laboratory, which dealt with forensic science. Based on his review of the testimony of the hospital's personnel, he testified that they did not follow accepted forensic methods when they tested Przislicki's blood sample. Accordingly, in Principe's opinion, the result of Przislicki's blood-alcohol test was unreliable. However, he also testified that he was not familiar with either the ACA machine used to test Przislicki's blood sample or the enzymatic method of testing used by the hospital. As a result, he could not specifically testify as to the accuracy or reliability of the blood test.

Brian E. Lavin, an expert for Przislicki and a biochemist, testified he was familiar with the operation of hospital laboratories and the ACA machine and he reviewed the testimony of the hospital's personnel. Lavin testified that some forms of betadine, which Adelberg testified she used to wipe Przislicki's skin before withdrawing blood, contain alcohol. On the other hand, if the solution was clear, as Przislicki testified, it may have been isopropyl alcohol. In either case, if the solution contained alcohol, it could have affected the result of the test.

Lavin also testified that two blood samples should have been taken rather than only one, the sample should have been put in a tube approved for forensic purposes, the tube should have been sealed, and the sample should have been identified by number rather than name. Additionally, the sample should not have been diluted, there was no record supporting Seguban's testimony that the sample was diluted, and the test was not run twice.

Based on Lavin's review of the hospital's records, the ACA machine had not been calibrated for 18 months prior to Przislicki's blood test. Lavin testified that the manufacturer did not recommend how often the machine should have been calibrated. However, he would have had the machine calibrated at every shift even though it would have been expensive and taken approximately three hours a day.

Lavin testified that the hospital's records indicated there was a problem with the internal temperature of the ACA machine, which was critical to its accuracy. On April 14, the day before Przislicki's test, the ACA machine was serviced for a temperature problem. On April 23, the records indicated maintenance for the same problem. Also, the ACA machine had to be kept at 37 degrees centigrade plus or minus .05 degrees. However, the hospital recorded the temperature only in whole numbers. Lavin conceded that if the temperature was out of the accepted range, it would have affected the results of the control pack.

From either a clinical or forensic standpoint, Lavin believed the results of Przislicki's test were unreliable.

The discharge hearing ended on May 19, 1988. In her report to the board, the hearing officer stated that conflicting evidence was presented as to whether Przislicki reported to work under the influence of alcohol. However, based on several witnesses' testimony that Przislicki's breath smelled of alcohol and his movements were unsteady, Przislicki's testimony that he had two beers before work, and the blood test result, Przislicki was "more likely than not" under the influence at the time he reported to work that day. The officer found that the city proved its charge against Przislicki by a preponderance of the evidence. The board issued a decision on July 12, 1988, and Przislicki was discharged.

Przislicki sought review of the board's decision by common law writ of *certiorari* to the circuit court. The trial judge affirmed the board's decision and Przislicki now appeals.

OPINION

■ The decision of an administrative agency may be reviewed by writ of *certiorari* when, as in the present case, the administrative agency has not expressly adopted the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*). (*Dubin v. Personnel Board* (1989), 128 Ill. 2d 490, 539 N.E.2d 1243.) The nature and extent of review under either method are virtually the same. *Dubin*, 128 Ill. 2d 490, 539 N.E.2d 1243.

■ Judicial review of an administrative agency's decision is limited to determining whether it was against the manifest weight of the evidence. (*Martin v. Thompson* (1990), 195 Ill. App. 3d 43, 551 N.E.2d 1082; *Zenith Vending Corp. v. Village of Schaumburg* (1989), 180 Ill. App. 3d 354, 535 N.E.2d 1033.) The reviewing court cannot evaluate the credibility of the witnesses or resolve conflicting evidence (*Martin*, 195 Ill. App. 3d 43, 551 N.E.2d 1082), and if the evi-

dence fairly tends to support the agency's decision, it should be affirmed (*Zenith*, 180 Ill. App. 3d 354, 535 N.E.2d 1033).

## I

■ Initially, Przislicki argues that the board's decision was invalid because it was not issued within 50 days of the hearing as required by the board's procedural rules. Section 26(h) of the board's administrative hearing procedures required that the board issue its decision on discharge within 50 days of the close of the hearing. In this case, the board issued its decision 54 days after the hearing. The city argues that the rule was merely permissive rather than mandatory.

However, at the time of the board's decision, the Chicago Municipal Code provided that when an employee appeals the decision of a department head to discharge him and a hearing is held before the board, it must issue a decision within 60 days after the hearing. (Chicago Municipal Code §2—74—060(b) (1990) (effective November 10, 1987).) Accordingly, the board's decision, issued within 60 days of the close of the hearing, was timely.

## II

Przislicki next argues the result of his blood-alcohol test was admitted without proper foundation.

■ ■ Both parties rely on *Woolley v. Hafner's Wagon Wheel, Inc.* (1961), 22 Ill. 2d 413, 176 N.E.2d 757, to support their positions. In *Woolley*, the supreme court found that the result of a blood-alcohol test was admissible in civil actions if a proper foundation was laid. The court stated:

> "In our opinion, in a civil case, the foundation laid for introduction of evidence of a blood analysis need not preclude every possibility of a doubt as to the identity of the specimen or the possibility of a change of condition in the blood. If the routine and procedures of a laboratory are shown by the evidence as having been commonly accepted by the medical profession, and the business of the laboratory is the securing, handling and analysis of blood specimens, amongst other types of specimens, those routines and procedures ought to be acceptable to the courts. *** Any discrepancy in [the witnesses'] testimony or concerning the adequacy of the records goes to the weight to be accorded the evidence rather than to its admissibility."

(*Woolley*, 22 Ill. 2d at 418-19, 176 N.E.2d at 760.) The strict rules of evidence that apply in a judicial proceeding do not apply in proceedings before an administrative agency. (*Giampa v. Illi-*

*nois Civil Service Comm'n* (1980), 89 Ill. App. 3d 606, 411 N.E.2d 1110.) Although *Woolley* did not involve the review of an administrative agency's decision, it lends guidance here.

To establish a foundation for admitting the test result, the city presented the testimony of Adelberg, Seguban, and Cummings, who were the hospital employees involved in testing Przislicki's blood sample. Adelberg testified she withdrew the blood sample into a tube, labelled it with Przislicki's name and social security number, and sent the sample to the laboratory. She took the sample at 2:43 a.m., and it was the only blood sample she was handling at the time. Seguban testified that the laboratory tested all the blood samples for the hospital. When she received Przislicki's sample, she prepared it for analysis by diluting it with distilled water and ran it through the ACA machine. Cummings testified that the test was completed at approximately 3:30 a.m. She read the result from the machine and multiplied it by two to compensate for the dilution. Adelberg, Seguban, and Cummings testified they followed standard, customary, and routine procedure when they handled Przislicki's blood sample.

Przislicki challenged the procedure of the hospital personnel in testing his blood sample with the testimony of his experts, Principe and Lavin. In detailed testimony, these experts criticized the manner in which Przislicki's blood sample was taken and tested. Principe, however, was not familiar with either the ACA machine or the method of testing used by the hospital. Some of Lavin's testimony was merely speculative, such as his testimony that the solution used to cleanse Przislicki's arm may have contained alcohol and that there may have been a problem with the internal temperature of the ACA machine when the sample was tested. Further, Principe and Lavin testified that the result of Przislicki's blood test was unreliable from either a forensic or clinical viewpoint.

Their testimony, however, merely conflicted with the testimony of Adelberg, Seguban, and Cummings. The board apparently resolved the conflicts in favor of the city, and this court cannot reweigh the evidence. *Martin*, 195 Ill. App. 3d 43, 551 N.E.2d 1082.

■ The testimony of Adelberg, Seguban, and Cummings met the foundation required under *Woolley* for admitting the result of Przislicki's blood-alcohol test. They established who handled the blood sample, the sample was tested within a short period of time after being drawn, it was tested according to customary, standard, and routine procedure, and the laboratory tested all the blood samples for the hospital. As a result, the blood test result was properly admitted.

## III

■ Przislicki also argues the board improperly excluded evidence that he followed the normal procedure when he operated the bridge and that the bridge itself was inherently unsafe. Przislicki, however, did not cite authority to support this argument in his brief and this court may consider the issue waived. (134 Ill. 2d R. 341(e)(7); *Collins v. Mid-America Bag Co.* (1989), 179 Ill. App. 3d 792, 535 N.E.2d 48.) We note that in the proceedings before the board, the city charged that Przislicki reported to work under the influence of alcohol. The cause of the accident was not at issue. As a result, Przislicki's offered evidence was not relevant to the issue before the board.

## IV

Lastly, Przislicki contends the board's finding that he reported to work under the influence of alcohol was against the manifest weight of the evidence because the city presented insufficient evidence and the city did not prove he was impaired.

■ In reviewing whether an administrative agency's decision was against the manifest weight of the evidence, the court cannot reweigh the evidence or reevaluate the credibility of the witnesses. (*Martin,* 195 Ill. App. 3d 43, 551 N.E.2d 1082.) If the decision of the board is supported by the evidence, it must be affirmed. *Zenith,* 180 Ill. App. 3d 354, 535 N.E.2d 1033.

Officers Burke and Hopkins, O'Malley and Magers from WMAQ-TV, and Nurse Adelberg all testified that they smelled alcohol on Przislicki's breath after the accident. Officer Burke testified that Przislicki's speech was slurred and his face was red. Burke thought Przislicki had been drinking and, although he did not think he was intoxicated, Burke did not think Przislicki was sober. Adelberg thought Przislicki had been drinking, although he did not exhibit visible signs of intoxication. However, based on the result of the blood-alcohol test, she thought he was intoxicated. Both Koncza and Karas, with the department, thought Przislicki had been drinking. Koncza testified that Przislicki's face was flush, he seemed nervous, his hands were shaking, and his steps were unsteady. Koncza conceded that Przislicki may have been under stress from the accident. Karas testified that he did not think Przislicki was intoxicated but he did not believe Przislicki was sober either. Przislicki admitted he drank two beers within three hours of reporting to work that day.

■ Further, Przislicki's blood-alcohol level was .152 at 2:40 a.m., which was five hours after he reported to work. The diagnosis was

acute alcohol intoxication. Dr. del Castillo testified that Przislicki's blood-alcohol level would have been between .200 and .300 at the time he reported to work. He also testified that Przislicki was under the influence of alcohol.

This evidence fully supports the board's conclusion that Przislicki reported to work when he was under the influence of alcohol.

Przislicki, however, contends that to support the board's finding that he was under the influence, the evidence must show that he was impaired. He argues by analogy that an employee's recovery under the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*) is not automatically barred if he was intoxicated (*M & M Parking Co. v. Industrial Comm'n* (1973), 55 Ill. 2d 252, 302 N.E.2d 265) and that sections 11–501(a)(3) and (a)(4) of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, pars. 11–501(a)(3), (a)(4)) prohibit driving under the influence of alcohol if the driver is incapable of driving safely. Przislicki ignores that section 11–501(a)(2) prohibits driving under the influence without mention of incapability. (Ill. Rev. Stat. 1989, ch. 95½, par. 11–501(a)(2).) Regardless, neither argument is persuasive here. The rule Przislicki was charged with violating prohibited reporting to work under the influence of alcohol without mention of impairment. The issue of impairment would address the question of whether Przislicki was at fault for the accident, which was not the issue before the board.

Based on a review of the record, the board's decision to discharge Przislicki from his employment with the city was not against the manifest weight of the evidence.

Affirmed.

MURRAY and GORDON, JJ., concur.