ALDEN NURSING CENTER—MORROW, INC., Plaintiff-Appellee, v. JOHN R. LUMPKIN, Acting Director of the Department of Public Health, Defendant-Appellant.

First District (4th Division)   No. 1—92—4429

Opinion filed March 17, 1994.

Roland W. Burris, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, and Alison E. O'Hara, Assistant Attorney General, of counsel), for appellant.

Greenburg & Hermann, of Chicago (Janet L. Hermann, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The Illinois Department of Public Health (Department) charged plaintiff, Alden Nursing Center, with a "Type B" violation under section 1—130 of the Nursing Home Care Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—130), and with violating sections 300.3240(a) and 300.3240(d) of the Department's "Minimum Standards, Rules and Regulations for Classification and Licensure of Long-Term Care Facilities" (Minimum Standards) (77 Ill. Adm. Code §§ 300.3240(a), (d) (1991)), after an Alden nurse's aide allegedly physically and verbally abused two residents and Alden failed to report the alleged verbal abuse to the Department. Following an administrative hearing, defendant, the Director of the Department, found against Alden. Alden sought administrative review, and the circuit court reversed the Director's ruling. The Director now appeals.

The following evidence was adduced at the administrative hearing. Alden resident Ronald Gray was a schizophrenic with a history of alcoholism and hypertension. Three times per week, Gray was transported to the Neomedica Dialysis Facility to undergo dialysis treatments. At Neomedica's request, Gray was accompanied on these trips by Jackie Shannon, a nurse's aide employed by Alden. Gray often had "outbursts" or was otherwise ill-behaved, and Neomedica personnel considered Shannon to be the only one who could control him.

Martha Jackson was a registered nurse and Neomedica unit manager. Jackson had worked at Neomedica since Gray began his treatments there shortly after December of 1988, and had encountered him at the facility over 100 times. Jackson testified that on January 3, 1990, shortly before Gray's treatment, she overheard Shannon making loud statements to Gray while the two were inside a patient's bathroom. Jackson testified that she heard Shannon threaten to "kick [Gray's] teeth in, beat the piss out of him and whip

his ass, if he didn't shape up and didn't listen to her." Shannon also warned Gray that his sister had given Shannon permission to do whatever she thought necessary to keep him in line. When Jackson heard this, she knocked on the bathroom door and ordered Shannon to come outside. She then reprimanded her about her shouting and said that her comments were inappropriate. Jackson testified that Shannon apologized for being loud but indicated that Gray drove her to it. Jackson acknowledged that Gray upset people, but told Shannon that such comments were not allowed in the clinic, and that she intended to report the incident to Alden.

Jackson subsequently accompanied Gray and Shannon to the waiting area. Jackson sat down next to Gray and asked Shannon to sit away from him because Jackson believed he looked scared as a result of the occurrence. Jackson testified that Gray was "not his usual self"; he had his hands in front of him and kept looking down and saying "I'll be good." When Jackson asked whether Gray wanted coffee, which he usually accepted, he refused for the first time. Jackson testified that Gray was normally jolly and singing and claiming to be God or the son of God; however, during the ensuing three-hour dialysis, Gray was quiet, withdrawn, frightened, and "not his usual self."

While Gray was in treatment Jackson telephoned Alden about the incident. Jackson testified that she spoke with Victoria Scott, Alden's assistant director of nursing, and told her that Shannon's conduct had distressed Gray, and requested that Shannon no longer be allowed to take him to Neomedica. Jackson also informed Scott of her intention to notify the Department about the incident. Jackson then notified the Department, both by telephone and then by letter on January 15, 1990.[1] In addition, Jackson sent a follow-up letter about the incident to Alden.

Victoria Scott testified that after speaking with Jackson on January 3, 1990, she reported the matter to Alden's director of nursing, Linda Houston. Later that afternoon, Scott discussed the situation with Shannon and Gray individually. Scott testified that Shannon denied physically abusing Gray or using profanity with him. Similarly, when Scott asked Gray whether anything had happened at the dialysis center, whether Shannon had cursed at him, or if he was afraid of her, Gray said no. According to Scott, Gray seemed fine that afternoon and conducted himself in his usual manner.

---

[1]Although Jackson's first letter to the Department mistakenly referenced the wrong "Alden" facility, she sent a corrected version to the Department soon after recognizing the error.

Scott reported her discussions with Gray and Shannon to Houston. Thereafter, on January 24, 1990, a meeting was held at Alden about the incident, attended by Scott, Jackson, Jackson's supervisor, and Alden's administrator, Witkins. Scott testified that Jackson exhibited an inexplicably hostile attitude at the meeting.

Linda Houston, Alden's director of nursing, testified that when she asked Shannon about the alleged verbal abuse Shannon appeared "shocked" and denied that anything had happened. Houston also asked Gray about it, and he too responded that nothing had happened. Houston corroborated Scott's testimony that Gray's behavior was not unusual that afternoon.

Houston testified that she reported the matter to Witkins and told him that she was going to prepare an incident report because she "was required" to do so. Witkins, however, instructed her not to prepare the report because the matter was purely hearsay and he wanted to conduct his own internal investigation. Witkins also told Houston that he would notify her if his investigation indicated that a report was warranted.

Houston testified that Shannon was interviewed at the January 24, 1990, meeting and that she denied anything had occurred. Houston indicated that following the meeting, Witkins declined to file a report with the Department even though she advised him to do so; he reiterated to her that the matter was based strictly upon hearsay and circumstantial evidence.

On February 22, 1990, a nurse and an Alden resident saw Shannon strike a patient, Harriet Clapton, on the side of her face with a balled fist. Although Clapton, a schizophrenic, had been acting belligerently and "striking out," she had not hit anyone. Alden employees immediately reported the incident to police. Additionally, the parties stipulated that Alden telephoned the Department and properly filed an incident report on the matter. Linda Houston terminated Shannon's employment that day.

On March 3, 1990, Louise Bergthold, a licensed nurse and investigator for the Department, went to Alden to investigate the alleged verbal abuse against Gray in response to Jackson's correspondence.[2] Bergthold examined Alden's files and found nothing about this incident. She also interviewed Houston, who stated that when she learned of the incident, her first inclination had been to dis-

---

[2]At this time, Bergthold was apparently unaware of Alden's incident report for the occurrence of February 22, 1990. She testified that she first learned about it while interviewing Houston during her investigation into the verbal abuse.

charge Shannon. According to Bergthold, Houston had been told by Scott that Jackson was a reliable source and not easily upset. Bergthold also interviewed Witkins, who admitted that he had done nothing to reprimand Shannon following the alleged verbal abuse. Bergthold testified that although Witkins considered the matter "all hearsay," he admitted he was unaware that Jackson had actually been present during Shannon's statements to Gray.

Bergthold also interviewed Gray during her investigation and inquired whether Shannon was ever "not nice" to him. Gray responded that Shannon had "yelled" at him and "said she wanted to *** hit" him while in the bathroom at dialysis. Bergthold testified that in her opinion, Shannon's conduct had upset Gray and caused him emotional or physical injury. Bergthold also believed that this injury was a direct threat to Gray's health, safety, and welfare. Bergthold further found that Harriet Clapton was physically injured by the February 22, 1990, occurrence, and the parties stipulated to this fact.

In May of 1990, the Department issued the notice of violation against Alden regarding the incidents of January 3, 1990, and February 22, 1990. The notice, pursuant to section 3—303(b) of the Act (Ill. Rev. Stat. 1989, ch. 111$^1$/$_2$, par. 4153—303(b)), ordered that Alden prepare and submit a plan of correction relative to each violation. Following the administrative hearing, the hearing officer issued a recommended decision detailing his findings of fact and conclusions of law. The officer concluded that Shannon's reprimands and threats had caused Gray to be withdrawn, frightened and upset, and constituted abuse under section 300.3240(a) of the Minimum Standards. The officer further found that Alden failed to properly report the incident to the Department as required under section 300.3240(d). Finally, he found that the physical abuse of Harriet Clapton constituted a violation of section 300.3240(a). The decision was subsequently adopted in its entirety by the Department.

Alden filed a complaint for administrative review (Ill. Rev. Stat. 1991, ch. 110, par. 3—101), and following a hearing, the circuit court reversed the findings of the Department and hearing officer. The instant appeal followed.

On appeal, the Director contends that the court erred in reversing the Department's decision as to all three violations of the Minimum Standards, because the decision was sufficiently supported by the evidence.

Administrative agencies are given wide latitude in exercising the discretion with which they are vested, and their findings of fact are considered *prima facie* true and correct. (*Rubly v. Edgar* (1991), 209

Ill. App. 3d 396, 398, 568 N.E.2d 113; *Farmers State Bank v. Department of Employment Security* (1991), 216 Ill. App. 3d 633, 639, 576 N.E.2d 532.) Courts may not interfere with this discretionary authority unless it was exercised in an arbitrary and capricious manner or the decision was against the manifest weight of the evidence. (*Rubly*, 209 Ill. App. 3d at 399; *Przislicki v. City of Chicago* (1991), 212 Ill. App. 3d 661, 668, 571 N.E.2d 762.) Further, a reviewing court may not reevaluate the credibility of witnesses or resolve conflicting evidence. (*Przislicki*, 212 Ill. App. 3d at 668.) A decision is contrary to the manifest weight of the evidence only where the reviewing court determines, viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency. (*Rubly*, 209 Ill. App. 3d at 399; *American Federation of State, County & Municipal Employees v. Illinois Educational Labor Relations Board* (1990), 197 Ill. App. 3d 521, 525, 554 N.E.2d 476.) Courts have interpreted this standard to require affirmance if there is *any* competent evidence in the record to support the agency's determination. *Farmer's State Bank*, 216 Ill. App. 3d at 640; see also *Przislicki*, 212 Ill. App. 3d at 668; *Piotrowski v. State Police Merit Board* (1980), 85 Ill. App. 3d 369, 406 N.E.2d 863; but see *Hoffmann v. Lyon Metal Products, Inc.* (1991), 217 Ill. App. 3d 490, 577 N.E.2d 514 (reversal necessary where agency's findings not supported by substantial evidence).

Section 300.3240(a) of the Minimum Standards parallels section 2—107 of the Act, under which the Minimum Standards were promulgated, and provides:

> "An owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident." (77 Ill. Adm. Code § 300.3240(a) (1991).

(Ill. Rev. Stat. 1989, ch. 111½, par. 4152—107.) Section 1—103 of the Act defines "abuse" as "any physical or mental injury or sexual assault inflicted on a resident other than by accidental means in a facility." (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—103.) The Director concluded that Alden's conduct was a "Type B" violation, which the Act defines as follows:

> "A 'Type "B" violation' means a violation of this Act or of the rules promulgated thereunder which creates a condition or occurrence relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." Ill. Rev. Stat. 1989, ch. 111½, par. 4151—130.

In reversing the Department, the trial court held that although Shannon's remarks were improper, they did not amount to a violation because there was no evidence that they had caused "injury" to Gray as provided under section 1—103 of the Act.

It appears that there is no case under the Act, nor under a provision precluding similar abuse in the Mental Health and Developmental Disabilities Code (Ill. Rev. Stat. 1989, ch. 91½, par. 1—101 *et seq.*), specifically defining "injury" or providing guidance as to the facts necessary to satisfy the injury requirement. Webster's dictionary defines "injury" as "an act that damages, harms, or hurts[,] *** an unjust or undeserved infliction of suffering or harm." (Webster's Third New International Dictionary 1164 (1986).) Additionally, the purpose of the Act was to redress the "inadequate and degrading" treatment being imparted to nursing home residents. *Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 357-59, 489 N.E.2d 1374.

■ With these principles in mind, we find that the Department correctly concluded that Shannon's remarks caused injury to Gray. Jackson was able to observe Gray for the hours immediately following Shannon's reprimand and described him as being frightened, withdrawn, and not his usual self during that period. This observance was corroborated by that of investigator Bergthold, who testified that Gray appeared injured and upset when speaking of the occurrence over one month later, and further stated that Shannon's conduct was a direct threat to his health, safety, and welfare, as sufficient for a "Type B" violation. (Ill. Rev. Stat. 1989, ch. 111½, par. 4151—130.) Although Gray apparently denied the entire occurrence when questioned by Scott and Houston, both ranking Alden employees, it was the function of the hearing officer, who heard the evidence firsthand, to resolve any conflicts in factual matters. Accordingly, because there were sufficient grounds to sustain the finding of the hearing officer, the trial court exceeded its authority in disturbing the Department's decision. See *Grove School v. Department of Public Health* (1987), 160 Ill. App. 3d 937, 513 N.E.2d 973.

The Director next contends that the court erred in reversing the finding that Alden committed a "Type B" violation of section 300.3240(b) by failing to report the verbal abuse to the Department. Alden responds that the court properly found no violation, because administrator Witkins had conducted his own investigation and determined that there was no reasonable basis to file such a report.

Section 300.3240(b) of the Minimum Standards provides as follows:

"(b) A facility employee or agent who becomes aware of abuse or neglect of a resident shall immediately report the matter to the facility administrator.

(c) A facility administrator who becomes aware of abuse or neglect of a resident shall immediately report the matter by telephone and in writing to the resident's representative.

(d) A facility administrator, employee, or agent who becomes aware of abuse or neglect of a resident shall also report the matter to the Department." 77 Ill. Adm. Code § 300.3240(b) (1991).

The Act's reporting provisions, sections 2—107 and 3—610 (Ill. Rev. Stat. 1991, ch. 111½, pars. 4152—107, 4153—610), are essentially identical to the Minimum Standards but require, pursuant to "The Abused and Neglected Long Term Care Facility Residents Reporting Act," that a report to the Department be made by any administrator or employee having "reasonable cause" to believe a resident has been subjected to abuse. Ill. Rev. Stat. 1991, ch. 111½, par. 4164.

■ Despite the fact that Witkins was apprised not only of the threatening nature of Shannon's remarks, but also of the fact that they had distressed and scared Gray, he nonetheless decided that he lacked "reasonable cause" to file a report. However, Alden offered no testimony to explain this position, and it is not otherwise supported by the record. Indeed, both Jackson and Houston considered the matter serious enough to warrant a report to the Department. The hearing officer concluded that sufficient cause existed to require reporting, and we defer to this finding.

Finally, the Director maintains that the court erred in reversing, without addressing the issue at the hearing, the Department's finding that Shannon's striking of Harriet Clapton constituted a "Type B" violation of section 300.3240(a). (77 Ill. Adm. Code § 300.3240(a) (1991).) Alden does not dispute that Shannon's conduct amounted to illicit physical abuse; however, it maintains that it committed no violation because it immediately notified both the police and Department and terminated Shannon's employment.

In determining whether, by failing to comply with the minimum standards in the Act and regulations, a facility has committed a violation of that Act, several criteria are considered. These include the severity of the finding; the danger posed to the resident's health and safety; the comments and documentation provided by the nursing home; the diligence and efforts to correct deficiencies; correction of the reported deficiencies; the frequency and duration of similar findings in previous reports; and the nursing home's general inspection history. (Ill. Rev. Stat. 1989, ch. 111½, par. 4153—212(c); 77 Ill. Adm. Code § 300.272(c) (1991); *Springwood Associates v. Lumpkin* (1992), 239 Ill. App. 3d 771, 780, 606 N.E.2d 733.) The preventative or remedial measures undertaken by the home do not automatically preclude the issuance of a violation; rather, they are merely factors to be considered in determining whether a violation should be issued, and if so, the level of violation. *Springwood*, 239 Ill. App. 3d at 783.

■ The physical abuse of Harriet Clapton was precipitated by an aide whose past use of profanity and threats towards another resident, Gray, had gone purposefully undocumented and unreported and were otherwise negligently resolved by Alden. A proper system of monitoring such employees as contemplated by the Minimum Standards may have prevented the injury to Clapton. Alden has provided no basis upon which to reverse the Department's ruling. Accordingly, the judgment of the circuit court of Cook County is reversed.

Reversed.

JOHNSON and THEIS, JJ., concur.