FIFTH DIVISION

                                            August 18, 2000 

No. 1-00-0578

SUBURBAN DOWNS, INC., 

Plaintiff-Appellant,

v.

ILLINOIS RACING BOARD, BALMORAL RACING CLUB, INC., MAYWOOD PARK TROTTING ASSOCIATION, INC., ASSOCIATES RACING ASSOCIATION, INC., ARLINGTON INTERNATIONAL RACE COURSE, INC., NATIONAL JOCKEY CLUB, HAWTHORNE RACE COURSE, INC., OGDEN FAIRMOUNT, INC., ILLINOIS THOROUGHBRED HORSEMEN'S ASSOCIATION, ILLINOIS HARNESS HORSEMEN'S ASSOCIATION, and ILLINOIS DIVISION, HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION,

Defendants-Appellees.

)

)

)

)

) )

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable 

Thomas P. Durkin, 

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

After a hearing to determine the allotment of racing dates for the year 2000, the Illinois Racing Board (the Board) refused to award harness racing dates to plaintiff Suburban Downs, Inc., instead awarding all harness racing dates to defendants Balmoral Racing Club, Inc. (Balmoral), and Maywood Park Trotting Association, Inc. (Maywood).  The plaintiff's complaint for administrative review in the circuit court was heard and denied.  On appeal, plaintiff argues that (1) the order entered by the Board was contrary to law in that the Board failed to make specific findings on the factors set forth in the Illinois Horse Racing Act of 1975 (the Racing Act) (230 ILCS 5/1 
et
 
seq
. (West 1996)); (2) denial of racing dates to plaintiff because of its use of the Fontana safety rail was a denial of due process of law and was arbitrary and capricious; (3) any comparative disadvantage resulting from the Fontana rail was offset by plaintiff's one-mile track; (4) the record shows that greater revenue to the state and purses to horsemen would be produced by granting racing dates to plaintiff; and (5) the record showed that the Board's decision was motivated by considerations not permissible under the Racing Act.  For the following reasons, we affirm the dates order issued by the Board.

Plaintiff, Suburban Downs, Inc., is an entity that conducts horse race meets and conducted harness racing at Hawthorne Race Course in Stickney, Illinois, from at least 1970 through 1997.
(footnote: 1)  Defendants Balmoral, Maywood, Arlington, Associates Racing Association (Associates), National Jockey Club (National Jockey), Hawthorne Race Course, Inc. (Hawthorne), and Ogden Fairmount (Ogden) are also entities that conduct horse racing meets in Illinois.  Balmoral conducts harness racing at Balmoral Park, in Crete, Illinois.  Maywood conducts harness racing at Maywood Park in Maywood, Illinois.  Chicago Downs Association (Chicago Downs) and Fox Valley Trotting Association (Fox Valley) have, in past years, conducted harness racing at Sportsman's Park in Cicero, Illinois, which adjoins Hawthorne Race Course.

Pursuant to the Racing Act, the Board is the agency charged with administering the Racing Act.  230 ILCS 5/2 (West 1996).  The Racing Act provides that any person desiring to conduct a horse race meeting may apply to the Board for an organization license.  230 ILCS 5/20(a) (West 1996).  In granting organization licenses and allotting dates for horse race meetings, the Board has discretion to determine an overall horse racing schedule that will, in its judgment, be conducive to the best interests of the public and the sport of horse racing.  230 ILCS 5/20(e-5) (West 1996).

In reaching its determination, the Board is to consider the following factors under Section 20(e-5) of the Racing Act:

(1) the character, reputation, experience, and financial integrity of the applicant and of any other separate person that either:

(i) controls the applicant, directly or indirectly, or

(ii) is controlled, directly or indirectly, by that applicant or by a person who controls, directly or indirectly, that applicant;

(2) the applicant's facilities or proposed facilities for conducting horse racing;

(3) the total revenue without regard to Section 32.1 to be derived by the State and horsemen from the applicant's conducting a race meeting;

(4) the applicant's good faith affirmative action plan to recruit, train, and upgrade minorities in all employment classifications;

(5) the applicant's financial ability to purchase and maintain adequate liability and casualty insurance;

(6) the applicant's proposed and prior year's promotional and marketing activities and expenditures of the applicant associated with those activities;

(7) an agreement, if any, among organization licensees as provided in subsection (b) of Section 21 of this Act; and

(8) the extent to which the applicant exceeds or meets other standards for the issuance of an organization license that the Board shall adopt by rule. 230 ILCS 5/20(e-5) (West Supp. 2000).

Through August 1 of each year, the Board accepts applications submitted by organizations seeking an award of racing dates for the next calendar year.
(footnote: 2)  230 ILCS 5/20(e) (West 1996).  The Board considers the applications and announces the award of the racing dates at its annual dates hearing in September.  Those announcements are not considered final until the Board executes a formal order.  230 ILCS 5/20(e) (West 1996).

The following facts were taken from the record before the Board at the dates hearing and from the Board's dates order for the year 2000.

Plaintiff has never been awarded harness dates other than in winter, with the exception of a 10-day harness meet in May of 1992.  For calendar years 1998 and 1999, plaintiff was not awarded any harness dates based on an agreement between all racetrack applicants.  Instead, as a result of Arlington's absence, Hawthorne requested and was granted more thoroughbred dates at Hawthorne Race Course.  Thoroughbred racing dates generate higher handle than harness dates and, as a result, Hawthorne's handle increased dramatically in 1998 and 1999 in comparison with prior years.

Additionally, the landscape of horse racing has changed markedly in recent years.  On May 30, 1995, the Racing Act was amended to permit Illinois licensees to accept pari-mutuel wagering on unlimited full-card simulcasts of race programs conducted out of state.  This amendment resulted in a substantial reduction of total wagering at Illinois locations on Illinois live racing, which was replaced by Illinois wagering on out-of-state races.  For example, from 1994 to 1999, the percentage of total handle (the amount of money wagered on horse racing) wagered on Illinois live racing decreased from 95% to 33%.  In this manner, full-card simulcasting substantially leveled the playing field among the track operators.  In addition, since the authorization of off-track wagering in Illinois, the percentage of total handle wagered at Illinois race tracks decreased from 34% to 18%.  The remaining percentage of handle is now wagered at intertrack and off-track locations.

On June 25, 1999, the Racing Act was amended again to eliminate host track status for matinee harness racing meets.  230 ILCS 5/3.075(e) (West Supp. 1999).  Prior to 1998, the Board awarded matinee harness racing dates and host track privileges to plaintiff in January and February.  On those dates, plaintiff benefitted from host track privileges and handle generated from the full-card simulcasting on out-of-state races, which included thoroughbred races.  With the absence of live Illinois thoroughbred racing during this period, plaintiff generated higher average daily handle numbers as compared to harness meets during nonexclusive portions of the racing schedule.  Comparing plaintiff's handle with more recent figures, in January and February of 1998 and 1999, National Jockey's matinee average daily handle at Sportsman's Park exceeded plaintiff's January and February 1997 average handle, even though National Jockey did not have the benefit of live racing.

In July 1999, plaintiff submitted its application to the Board.  In its application, plaintiff sought harness racing dates at Hawthorne Race Course for the period of May 7 through September 2, 2000.  Balmoral also applied for harness racing dates for four days per week throughout the year 2000, with races to be conducted at Balmoral Park.  Maywood and Associates both applied for harness racing dates for three days per week throughout the year 2000, with races to be conducted at Maywood Park.  Chicago Downs and Fox Valley did not apply for racing dates.

In addition to their applications, and as they did in the years 1995 through 1999, each applicant submitted a written waiver of the contested cases provisions of the Illinois Administrative Procedures Act (5 ILCS 100/1-1 
et seq.
 (West 1994)) (hereinafter the Act), and elected to present evidence to the Board at an informal dates hearing conducted on September 21, 1999.  Specifically, each applicant, including plaintiff, signed a waiver that provided as follows:

"The undersigned, on behalf of [applicant's name], being fully advised, and in the interest of a speedy, practical and equitable resolution by the Illinois Racing Board of the issues involved in the award of racing dates for the calendar year 2000, does hereby waive any and all rights to a hearing in accordance with the 'contested cases' provisions of the Administrative Procedures Act, (ILCS Ch. 5, Sec. 10-25 through 10-70), prior to the award of 2000 racing dates to applicants therefor."

At the dates hearing, the Board determined that each applicant had an extensive history of conducting race meets in Illinois over a period of many years.  The Board also determined that all of the applicants possessed the character, honesty, and financial integrity to operate the race meets requested, and to purchase the necessary casualty and liability insurance.  The Board found that each applicant had attempted to recruit, train, and promote minority employees.  The Board stated that the applicants had not presented any agreements between them with respect to racing dates.

Concerning the applicants' facilities for harness racing, the Board focused on the types of rails used at the different tracks.  Balmoral Park and Maywood Park are exclusively harness tracks and utilize the "hubless hub rail."  The hubless hub rail is a series of pylon cones outlining the track perimeter.  The hubless hub rail allows the harness horseman to pull to the inner perimeter of the track to avoid an accident.  On the other hand, there are both thoroughbred and harness meets held at Hawthorne Race Course and it utilizes the "Fontana rail."  The Fontana rail is a solid, continuous hub rail.  The Fontana rail prevents horses from entering the inner perimeter of the track; thus, harness horsemen cannot avoid accidents in that manner.

Plaintiff knew for many years that both the Board and the harness horsemen were concerned with the Fontana rail used at Hawthorne Race Course.  In the dates orders for 1994 through 1999, the Board noted that Hawthorne Race Course utilized the Fontana rail.  The Board also pointed out that Balmoral Park and Maywood Park utilized the hubless hub rail, which was considered by harness drivers to be the most important and effective safety feature available.

Prior to the dates hearing for the year 2000, plaintiff was notified that its continued use of the Fontana rail raised serious safety concerns.  One week prior to the dates hearing, both plaintiff and the Board received a letter from the president of the Illinois Harness Horsemen's Association (IHHA)
(footnote: 3) which read, in part:

"Safety is always a paramount concern.  Horsemen and their horses must have the safest facility possible for racing.  IHHA believes the hub rail system in place at Hawthorne [Race Course], though a newer generation that is safer than most others, is not as safe for harness racing as having no hub rail at all.  Racing with no hub rail is recognized by all major horse racing authorities as being the safest for harness racing.  Accidents involving sulkies, horses, and a hub rail, while not common, are always a possibility and IHHA cannot support this."

IHHA concluded the letter by stating that it would not support plaintiff's application for harness racing unless a hubless hub rail was installed at Hawthorne Race Course.  Rather, IHHA stated it would support Balmoral's and Maywood's applications since those tracks already used hubless hub rails.  This was the first time IHHA failed to support an application by plaintiff.

IHHA reiterated its safety concerns and its opposition to plaintiff's application through testimony at the dates hearing.  The president of IHHA explained as follows:

"The misconception is that [the Fontana rail is] unsafe because a horse or a race bike could hook it or run into it.  That's not the case at all. Having the extra option when you're in a race and a horse falls in front of you, to be able to get inside of a wreck is paramount, it's huge.  One of the only times, thank God, I've ever been hurt in my life was at Hawthorne [Race Course] when a horse fell in front of me in mid stretch and I couldn't get to the inside to avoid the accident.  It's not a matter of hooking the hub rail, those are very rare."

IHHA's president further testified that the national trend in harness racing was to use the hubless hub rail:

"As you can see, the national trend [is that] all the major race tracks that are striving for excellence are getting rid of the hub rail.  It's just, it's too much money and too many lives on the line to still have the hub rail."

Plaintiff, however, argued that the hubless hub rail was not the only safe rail available for harness racing.  Plaintiff submitted the opinion of an expert, Chuck Coon, stating that the Fontana rail was safe for harness racing and that the same rail was in use at several tracks across the United States and Canada.  However, the Board noted that Coon was more of a surface expert than a rail expert.  Plaintiff ultimately acknowledged that the Fontana rail may not be ideally suited for harness racing, but stated that the rail was safe for both standardbred and thoroughbred racing.  Despite the fact that the president of IHHA stated IHHA would support harness racing by plaintiff if the rail was changed, plaintiff did not offer to replace the Fontana rail with the hubless hub rail.

The total revenue derived by the state and horsemen from the conduct of race meetings was also argued before the Board.  At the dates hearing, the president of IHHA testified that since Balmoral and Maywood took over the harness racing dates, harness racing had excelled both nationally and within the state.  He stated that the simulcasting handle to other states was almost double the revenue received from them, which was even better for harness racing than competition between plaintiff, Balmoral, and Maywood.  He also predicted that purses and handles would remain the same whether summer dates were awarded to Balmoral Park or Hawthorne Race Course, but that revenues from simulcasting would be somewhat lessened if the races were held at Hawthorne Race Course.

Plaintiff argued to the Board that both plaintiff's and Sportsman's Park's average daily handles were greater than Balmoral Park's or Maywood Park's handles in prior years, going back as far as 1991.  However, neither plaintiff nor Sportsman's Park had hosted any harness meets since 1997.

In the dates order for the year 2000 racing dates, the Board set forth the average daily handle and the government revenue generated at each 1999 race meet through September 6, 1999.  The Board also stated the percentage of total handle wagered on-track and the percentage of total handle wagered on Illinois races for the period of 1994 through 1999.  The Board's order noted that, as a result of an amendment to the Racing Act, the pari-mutuel tax rate was adjusted to a flat tax of 1.5% on all wagers at all Illinois licensed facilities.  The Board stated that the amendment emphasized the total pari-mutuel handle as it related to maximizing state revenues from horse racing.  The Board also noted that most of the indirect sources of revenue from racing such as admission tax, sales tax, and income tax tended to have a positive correlation with handle and, therefore, increased as handle increased.

The Board also received evidence regarding each applicant's proposed promotional budget.  Balmoral, Maywood, and plaintiff submitted promotional/advertising budgets for the year 2000 of $1.3 million, $940,000, and $790,000, respectively.

At the close of the evidence and arguments, Chairman Lamb recommended that the Board repeat the 1999 schedule, which granted dates to Balmoral and Maywood, because that schedule had proven exceptionally strong financially, had raised the quality of Illinois standardbreds dramatically, and had brought the purse structure to an all-time high.  Commissioner Propes seconded Chairman Lamb's recommendation, stating:

"The situation on the harness [racing] side is that Balmoral and Maywood together have achieved pre-eminence in this country, have set records this year in terms of handle and live racing in terms of the recent history, and we have heard from all sides of the harness industry that these strides are important, that they're real, that they should be kept going."

After reviewing the applications and the evidence presented at the meeting, and after officially noticing all records in its possession, including the applications, the Board's annual reports, past dates orders, and staff reports, the Board issued its order allotting the year 2000 racing dates.  The order granted harness racing dates to Balmoral, Associates, and Maywood.  The Board did not award plaintiff any harness racing dates for the year 2000.

Plaintiff filed a complaint for administrative review on November 12, 1999.  On February 10, 2000, the circuit court heard and denied plaintiff's complaint.  The circuit court found that the Board had considered the revenue factor, along with the other factors required by section 20(e-5) of the Racing Act, in reaching its decision.  The court also determined that, based on the legislature's clear pronouncement, plaintiff did not have a property right in racing dates and that nothing in the record supported plaintiff's assertion of a due process violation.  The court further found that the Board's decision was not against the manifest weight of the evidence, nor was it arbitrary and capricious.

Plaintiff now appeals.

The central issue raised by this appeal is whether the Board's dates hearing and resulting dates order for the year 2000 denied plaintiff's due process rights.  Plaintiff argues that its interest in harness racing dates constitutes a property right of which it cannot be deprived without due process of law.  Plaintiff further argues that it was deprived of said property right without due process in that the Board's order, which refused plaintiff's request for harness racing dates for the year 2000, did not give explicit findings on each of the statutory factors listed in section 20(e-5) of the Racing Act.

Administrative proceedings are subject to the requirements of due process.  
Akmakjian v. Department of Professional Regulation
, 287 Ill. App. 3d 894, 896, 679 N.E.2d 783 (1997).  The starting point in any due process analysis is a determination of whether a protectable interest is present, "for if there is not, no process is due."  
Polyvend, Inc. v. Puckorius
, 77 Ill. 2d 287, 294, 395 N.E.2d 1376 (1979).  The United States Supreme Court held that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  
Board of Regents of State Colleges v. Roth
, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709 (1972).  A legitimate claim of entitlement may arise from statute, regulation, municipal ordinance, or express or implied contract.  
Akmakjian
, 287 Ill. App. 3d at 896.

Plaintiff failed to identify any statutory authority to support the premise that it had a property right in racing dates.  Plaintiff asserts that it had a vested property interest in an organization license and cites to 
Balmoral Racing Club, Inc. v. Illinois Racing Board
, 151 Ill. 2d 367, 405-06, 603 N.E.2d 489 (1992), where the supreme court stated:

"We hold today that every racing license creates a property interest, for, surely, denial of any racing license forecloses pursuit of a racing establishment's occupation.

***

Without races, a racetrack becomes useless and the investment to maintain that race track is worthless. *** We conclude that this interest in maintaining an occupation makes Balmoral's interest in retaining a license a property interest which cannot be denied without affording due process."

However, subsequent to the decision in 
Balmoral
, the Illinois legislature amended the Racing Act to state:

"The granting of an organization license to a person constitutes a privilege to conduct a horse race meeting under the provisions of this Act, and no person granted an organization license shall be deemed to have a vested interest, property right, or future expectation to receive an organization license in any subsequent year as a result of the granting of an organization license."  230 ILCS 5/20(f) (West 1996).

Therefore, it is clear that there was no legislative intention to confer a "claim of entitlement" on applicants for racing dates.  Absent such an interest, it cannot be said that the applicants had a recognizable property right within the meaning of the federal or state constitution.  See 
Polyvend
, 77 Ill. 2d at 295.  In the absence of a property right, there can be no due process violation.

Plaintiff argues that property rights, once acquired, cannot be dissolved by the legislature without due process.  We choose not to reach the issue of the constitutionality of section 20(f) of the Racing Act, however, because the constitutionality of the statute is not essential to the disposition of this case.  A court will consider a constitutional question only where essential to the disposition of a case, 
i.e.
, where the case cannot be determined on other grounds.  
Bonaguro v. County Officers Electoral Board
, 158 Ill. 2d 391, 396, 634 N.E.2d 712 (1994).  Here, we find that plaintiff
 voluntarily waived any existing due process rights.

In 
Balmoral
, 151 Ill. 2d at 397, the supreme court determined that the Administrative Procedure Act applied to dates hearings conducted by the Board.  The court found that the Board cannot focus exclusively on one factor when determining the racing schedule, but must consider all of the factors listed in section 20(e-5) of the Racing Act.  The court in 
Balmoral
 stated that the dates order at issue was defective because the Board improperly focused exclusively on one factor.  Thus, the court stated that the findings of the Board should be made evident in the dates orders to ensure that the Board had considered the appropriate factors in accordance with the Act.  
Balmoral
, 151 Ill. 2d at 396.  However, we find that 
Balmoral
 is distinguishable from this case due to the fact that the parties in 
Balmoral
 did not waive their rights under the Act.

In this case, prior to the dates hearing, plaintiff knowingly and voluntarily submitted a written waiver of any and all rights to a hearing in accordance with the contested cases provisions of the Act and elected instead to present evidence to the Board at an informal dates hearing conducted on September 21, 1999.  By taking this action, plaintiff waived, among other formalities, any requirement that the Board include in its written order findings of fact and conclusions of law separately stated and a concise and explicit statement of the underlying facts supporting the findings.  Having waived these rights, plaintiff cannot now argue that it was denied due process because the Board's dates order does not contain such findings and conclusions.  In addition, the proceedings in this case were informal as a result of the waiver signed by plaintiff and any arguments that the dates hearing or dates order should have been more formal have been waived by plaintiff.

Additionally, we find that the Board's findings were not contrary to the manifest weight of the evidence, nor were they arbitrary and capricious.

Administrative agencies are given wide latitude in exercising the discretion with which they are vested.  
Alden Nursing Center-

Morrow, Inc. v. Lumpkin
, 259 Ill. App. 3d 1027, 1031, 632 N.E.2d 66 (1994).  The factual findings and conclusions of an administrative agency are viewed as 
prima facie
 correct, and a reviewing court will not disturb those findings unless they are contrary to the manifest weight of the evidence.  See 735 ILCS 5/3-110 (West 1996); 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111(1992).  It is the function of the administrative agency to evaluate all evidence, judge the credibility of witnesses, resolve conflicts in the evidence and draw reasonable inferences and conclusions from the facts.  
Smith v. Department of Professional Regulation
, 202 Ill. App. 3d 279, 284, 559 N.E.2d 884 (1990).  A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.  
Abrahamson
, 153 Ill. 2d at 88.  If the record contains evidence supporting the administrative agency's decision, the decision should be affirmed.  
Abrahamson
, 153 Ill. 2d at 88.  A reversal is warranted only where the reviewing court determines, after viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency's decision.  
Lumpkin
, 259 Ill. App. 3d at 1032.

It is clear from the record in this case that the Board considered all of the required factors under section 20(e-5) of the Racing Act.  The evidence presented to the Board and the determinations made by the Board regarding the applicants' rails, handle, and revenue were laid out in great detail earlier in this opinion and will not be repeated here.  Given the transcript of the dates hearing and the dates order, we cannot say that the decision of the Board was contrary to the manifest weight of the evidence.  Moreover, the record does not support a finding that the Board was motivated by considerations that are impermissible under the Racing Act.  The record contains substantial evidence to support the Board's dates order, and we find that the decision of the Board was not arbitrary and capricious.  Therefore, we affirm the decision of the Board granting racing dates for the year 2000.

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.

FOOTNOTES
1: Plaintiff did not conduct harness races in the calendar years 1998 and 1999 pursuant to an agreement between the applicants.  Plaintiff explained that over the years the Illinois Racing Board has tailored its allocation of racing dates to fit Arlington International Race Course, Inc.'s (Arlington's) thoroughbred schedule.  Shortly before the 1997 dates hearing (where the dates for 1998 would be determined), Arlington decided not to race.  As a result, the applicants agreed that plaintiff also would not race in order to allow January and February afternoons to be used to generate purses for the thoroughbred meeting that was to commence on March 1.

2: The Board has authority to award dates for up to three consecutive calendar years, but it ordinarily only awards dates for the next calendar year.  230 ILCS 5/20(f) (West 1996).

3: IHHA is a not-for-profit corporation comprised of owners, breeders, trainers and drivers of standardbred horses.  IHHA's purpose is to promote the welfare of harness racing in the United States and Canada, with special regard to Illinois.